*In re* MOROUN

Docket No. 308053. Submitted February 2, 2012, at Detroit. Decided
February 6, 2012, at 9:00 a.m. Leave to appeal denied, 491 Mich
855.

The Michigan Department of Transportation (MDOT) brought an
action in the Wayne Circuit Court against the Detroit International
Bridge Company (DIBC) and Safeco Insurance Company of America,
alleging that DIBC had failed to construct its portion of the Ambas-
sador Bridge Gateway Project in accordance with an agreement that
had been executed between MDOT and DIBC. Safeco, as surety, had
issued a performance bond supporting DIBC's portion of the project.
MDOT filed two motions for partial summary disposition. MDOT
first moved for a partial judgment ordering DIBC to construct a
two-lane access road for the project. MDOT then moved for a partial
judgment ordering DIBC to complete construction of its portion of
the project in accordance with the plans attached to the performance
bond. DIBC countered that the parties had only committed to a
design concept and that there was no final, agreed-upon set of plans
for the project. On February 1, 2010, the court, Prentis Edwards, J.,
granted both motions and ordered DIBC to complete construction of
its portion of the project in accordance with the plans attached to the
performance bond. The Court of Appeals denied DIBC's interlocutory
application for leave to appeal. The Supreme Court also denied
DIBC's application for leave to appeal. 486 Mich 937 (2010). In the
trial court, DIBC moved for revision, clarification, and amendment of
the February 1, 2010, order for specific performance. The trial court
denied the motion and subsequently issued a show-cause order
compelling DIBC to appear and explain why it should not be held in
contempt for failing to comply with the February 1, 2010, order. After
several postponements, partially resulting from DIBC's unsuccessful
attempts to remove the lawsuit to federal court, the show-cause
hearing was held in December 2010. On January 10, 2011, the trial
court ruled that DIBC was failing to comply with the court's Febru-
ary 1, 2010, order and was in civil contempt. The court ordered that
Dan Stamper, president of DIBC, be incarcerated until DIBC began to
comply with the February 1, 2010, order. The court ordered Stamp-
er's release later the same day after learning that DIBC had taken
steps to comply with the order. In June 2011, MDOT filed an ex parte

motion for continuation of the contempt proceedings, alleging that DIBC was continuing to violate the trial court's February 1, 2010, order. The trial court issued a show-cause order, directed at Stamper and DIBC, to appear and explain why DIBC should not be held in civil contempt. Following further hearings on the matter, on November 3, 2011, the trial court issued an opinion and order holding that DIBC was, again, in civil contempt for failing to comply with the February 1, 2010, order. The court listed several options it was considering to coerce compliance and directed that "the top company officer for DIBC" and Manuel J. Moroun, a director of DIBC and its owner, DIBC Holdings, Inc., appear before the court on January 12, 2012, to address the sanctions issue. On that date, after discussing several options for sanctions, the Court stated that DIBC was best equipped to complete the project and that the key decision-makers, whom the court identified as Stamper, Moroun, and Moroun's son (the vice president of DIBC), had the responsibility to ensure DIBC's compliance. The court ordered that Moroun and Stamper be incarcerated until DIBC "fully complied" with the trial court's February 1, 2010, order or until they no longer had the power to comply with it. Moroun and Stamper appealed and moved for release pending appeal. The Court of Appeals denied the motion for release pending appeal. Stamper and Moroun then moved for peremptory reversal and a stay. The Court of Appeals denied the motion for peremptory reversal but granted, in part, the motion for stay, releasing Stamper and Moroun pending further order of the Court.

In a lead opinion by K. F. KELLY, J., and separate opinions by WILDER, P.J., and FORT HOOD, J., the Court of Appeals *held*:

1. An order finding a party in civil contempt of court is not a final order for purposes of appellate review by right. However, the right of a nonparty to appeal an adjudication of contempt cannot be questioned even in the absence of a final order. The same principle applies to individuals not personally held in contempt but sanctioned as decision-makers to enforce a company's compliance with a court order. Accordingly, the Court of Appeals had jurisdiction to hear Stamper and Moroun's appeal as an appeal by right.

2. Individuals who are officially responsible for the conduct of a corporation's affairs are required to obey a court order directed at the corporation, and they may be sanctioned if they fail to take appropriate action within their power to ensure that the corporation complies with the court order. Accordingly, Stamper and Moroun could be held accountable for failing to ensure DIBC's compliance with the trial court's order.

3. A civil contempt proceeding requires only rudimentary due process. In other words, it requires notice and an opportunity to be

heard. When contempt is committed outside the court's view, MCL 600.1711(2) permits the court to punish the contemnor by fine or imprisonment, or both, after proof of the facts charged has been made by affidavit or other method and an opportunity has been given to defend. The court must also comply with MCR 3.606(A), which, on a proper showing on ex parte motion supported by affidavits, requires that the trial court (1) order the accused person to show cause, at a reasonable time specified in the order, why that person should not be punished for the alleged misconduct or (2) issue a bench warrant for the arrest of the person. With regard to Moroun, he was a director of DIBC and his living trust held the majority of the voting shares in DIBC Holdings, which owned DIBC. He admitted that he had been informed about the project and the trial court's order regarding the project. The trial court's November 3, 2011, opinion and order finding DIBC in contempt discussed possible sanctions, including imprisonment, and directed Moroun to appear at the hearing on sanctions. Accordingly, he was provided notice that he might be sanctioned for DIBC's contempt and an opportunity to be heard on the matter. With regard to Stamper, he was listed on the show-cause order, was present throughout the contempt proceedings, actively participated in DIBC's defense, and had previously been incarcerated for DIBC's contempt. There was no dispute regarding Stamper's authority over the company and the project. Accordingly, he had notice that he might be incarcerated as a coercive sanction for DIBC's contempt and was provided an opportunity to be heard on the matter.

4. Confinement or imprisonment may be imposed whether the contempt is civil or criminal in nature. In the context of civil contempt, the term of imprisonment ceases when the contemnor complies with the court's order or no longer has the power to comply. The contemnor must be able to purge the contempt and obtain release by performing an affirmative act or duty. In other words, the contemnor must carry the keys to the prison in his or her own pocket. The commitment order must specify the act or duty.

5. The trial court's decision to use coercive measures that included incarceration was not an abuse of discretion. In this case, however, the trial court's order of imprisonment could not be upheld because the order failed to adequately identify the act or duty Stamper and Moroun had to perform to purge the contempt.

6. Contrary to the assertions of Stamper and Moroun, the trial court did not act as both an accuser and finder of fact by imposing a sanction that was not requested by MDOT. The court provided an adequate explanation of why the alternative sanctions were inadequate.

Affirmed in part, vacated in part, and remanded; judgment given immediate effect in light of pending hearing by the trial court on the status of the project.

WILDER, P.J., concurring in part and dissenting in part, agreed that the Court of Appeals had jurisdiction over the claim of appeal, but reasoned that because they were nonparties, the order sanctioning Stamper and Moroun was a final order appealable by right under MCR 7.202(6)(a)(i). The lead opinion also correctly concluded that the trial court's commitment order failed to adequately identify what actions Stamper and Moroun were required to take that would allow them to immediately purge themselves of the contempt finding made against DIBC. Stamper and Moroun, however, did not receive sufficient notice that they could personally be held in contempt and punished. The plain meaning of MCR 3.606(A)(1) requires that an individual be given direct notice to appear and show cause why he or she should not be held in contempt for specific contumacious conduct. Because such notice was not given to Stamper and Moroun in this case, the contempt sanctions imposed against them violated due process of law. Because the issue had not been previously addressed in Michigan and the panel issued three separate opinions, the judgment of the Court of Appeals should not have been given immediate effect.

FORT HOOD, J., concurring in part and dissenting in part, joined in and concurred with the lead opinion in all respects except with regard to the sanction of imprisonment and would have affirmed the trial court's decision in its entirety. Although civil contempt is primarily coercive in nature, the sanction for civil contempt may also have a punitive effect. Imprisonment for civil contempt might be forever as long as it is within the contemnor's power to comply with the court order he or she has refused to carry out. The court must use the least possible power necessary to achieve the proposed end, but the propriety of the contempt sanction is contingent on the facts and circumstances in each individual case. The commitment order was justified in this case in light of DIBC's willful, continuous, and contemptuous failure to comply with the trial court's February 1, 2010, order. Promised future compliance with prior judicial orders is a common and appropriate method of purging contempt. Stamper and Moroun had the means and knowledge to immediately purge the contempt by promises of future compliance or good-faith efforts to comply with the court's order. Thus, the trial court did not abuse its discretion by imposing an order of contempt and incarcerating them until the project was completed.

1. CONTEMPT — CIVIL CONTEMPT — APPEAL BY RIGHT — JURISDICTION — FINAL ORDER — NONPARTIES.

An order finding a party in civil contempt of court is not a final order for purposes of appellate review by right, but the right of a nonparty to appeal an adjudication of contempt cannot be questioned even in the absence of a final order; the same principle applies to individuals not personally held in contempt, but sanctioned as decision-makers to enforce a company's compliance with a court order (MCL 600.308[2]; MCR 7.202[6][a]).

2. CONTEMPT — CIVIL CONTEMPT — CORPORATIONS — OFFICERS AND AGENTS.

Individuals who are officially responsible for the conduct of a corporation's affairs are required to obey a court order directed at the corporation, and they may be sanctioned if they fail to take appropriate action within their power to ensure that the corporation complies with the court order.

3. CONTEMPT — CIVIL CONTEMPT — INDIRECT CONTEMPT — DUE PROCESS.

A civil contempt proceeding requires only rudimentary due process, i.e., notice and an opportunity to be heard; when contempt is committed outside the court's view, the court may punish the contemnor by fine or imprisonment, or both, after proof of the facts charged has been made by affidavit or other method and an opportunity has been given to defend; on a proper showing on ex parte motion supported by affidavits, the trial court must (1) order the accused person to show cause, at a reasonable time specified in the order, why that person should not be punished for the alleged misconduct or (2) issue a bench warrant for the arrest of the person (MCL 600.1711[2]; MCR 3.606[A]).

4. CONTEMPT — CIVIL CONTEMPT — SANCTIONS — CONDITIONAL IMPRISONMENT.

Confinement or imprisonment may be imposed whether the contempt is civil or criminal in nature; in the context of civil contempt, the term of imprisonment ceases when the contemnor complies with the court's order or no longer has the power to comply; the contemnor must be able to purge the contempt and obtain release by committing an affirmative act or duty, and the commitment ʾorder must specify the act or duty (MCL 600.1715[2]).

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Robert L. Mol*, *LuAnn Cheyne Frost*, and

*Michael Dittenber*, Assistant Attorneys General, for the Department of Transportation.

*Kerr, Russell and Weber, PLC* (by *William A. Sankbeil* and *Joanne Geha Swanson*), *Young & Susser, P.C.* (by *Rodger D. Young*), and *Domina Law Group PC LLO* (by *David A. Domina*) for Manuel J. Moroun.

*Mogill, Posner & Cohen* (by *Kenneth M. Mogill* and *Jill M. Schinske*) and *Domina Law Group PC LLO* (by *David A. Domina*) for Dan Stamper.

Before: WILDER, P.J., and K. F. KELLY and FORT HOOD, JJ.

K. F. KELLY, J. Appellants, Manuel J. Moroun and Dan Stamper, appeal as of right the trial court's January 12, 2012, order directing that they be imprisoned in the Wayne County jail until defendant Detroit International Bridge Company (DIBC) fully complied with the trial court's opinion and order of February 1, 2010. Moroun is a director of DIBC and Stamper is its president. Previously, on November 3, 2011, the trial court found DIBC in civil contempt for failing to comply with the February 1, 2010, order, which had been entered in the underlying lawsuit filed by plaintiff Michigan Department of Transportation (MDOT) against DIBC and Safeco Insurance Company of America.[1] We conclude that appellants' due-process rights were not violated and that the trial court was clearly acting within its inherent and statutory powers to order DIBC's key decision-makers incarcerated pend-

---

[1] As explained in greater detail later in this opinion, the underlying lawsuit concerns a large construction project undertaken by MDOT and DIBC. Safeco, as surety, issued a performance bond supporting DIBC's portion of the project.

ing DIBC's compliance with the trial court's February
1, 2010, order. However, the commitment order requir-
ing full compliance cannot stand because appellants do
not have the immediate ability to completely finish
construction and thus "purge" DIBC of the contempt.
Because the commitment order does not provide appel-
lants with the "keys to the jailhouse," we vacate that
portion of the trial court's commitment order that
continues incarceration until DIBC has "fully com-
plied" and remand the case to the trial court. On
remand, the trial court shall craft an order stating with
particularity what act or duty appellants must perform
both to ensure that DIBC will begin and continue
compliance with the court's February 1, 2010, order as
well as to enable them to purge themselves of the
contempt finding against DIBC. Accordingly, we affirm
in part, vacate in part, and remand for further proceed-
ings consistent with this opinion.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The underlying lawsuit arises from the Ambassador
Bridge Gateway Project, which is intended to facilitate
the flow of traffic between the United States and
Canada over the Ambassador Bridge (the Bridge) by
constructing interstate freeway connections to the
Bridge. DIBC owns and operates the Bridge. Stamper is
the president of DIBC and is extensively involved in the
operation and construction activities at the Bridge and
in the defense of this lawsuit. Moroun has a living trust
that is a minority shareholder of DIBC Holdings, Inc.,
which, in turn, owns DIBC. Moroun is also a director on
the boards for DIBC and DIBC Holdings.

In April 2004, MDOT and DIBC executed an agree-
ment, which required DIBC to construct Part A of the
project in accordance with MDOT specifications and

standards; plans and designs were attached to the contract as exhibits. DIBC was responsible for 100 percent of the costs associated with Part A, including construction and property acquisition costs. Because DIBC was unable to acquire all the property interests needed to complete Part A, the contract was amended in February 2006, whereby MDOT assumed responsibility to acquire, through the power of eminent domain if necessary, the property interests encompassed by a portion of Part A. On March 12, 2007, a performance bond was executed, which provided that DIBC and Safeco "are held and firmly bound unto" MDOT in the penal sum of $34,664,650 and that "the condition of this obligation" is that "the above named principal shall and will, well and faithfully, and fully . . . execute and perform all of the obligations contained in the attached documents identified as Exhibits A through Exhibit E, listed below." Exhibit E was described in the bond as "Plans for DIBC portion of the Ambassador Bridge/Gateway Project (Part A, DIBC portion) per MDOT/DIBC agreement as amended." In November 2007, MDOT and DIBC also executed a maintenance agreement, whereby DIBC agreed to maintain and operate certain physical features or structures located on a portion of M-85, including a truck road and related infrastructure, and a gate system. The parties also agreed that DIBC could use M-85, the I-75 exit ramp, and an access easement road in emergency situations, under certain conditions and limitations set forth in the agreement.

On June 24, 2009, MDOT filed a lawsuit against DIBC and Safeco alleging that DIBC had not performed the construction in accordance with the agreements. Among other claims, MDOT alleged that DIBC was constructing Part A according to a "Conflicting Design," a plan not approved by MDOT, the Federal

Highway Administration, or the city of Detroit, which included (1) constructing permanent tollbooths in the location where DIBC had agreed to construct an access easement drive, (2) installing facilities including automobile-fueling pumps in the location where it had agreed to construct DIBC Ramp S04, the ramp over 23rd Street for traffic to Canada, (3) installing facilities including underground fuel tanks in the location where it had agreed to construct the two-lane truck road and DIBC Ramp S05, the ramp over 23rd Street carrying truck traffic to the interstate highways, and (4) constructing Pier 19 at a location that blocks construction of the two-lane truck road from the truck plaza, as well as a "special return route" for maintenance and emergency vehicles. MDOT sought a cease-and-desist order regarding ongoing construction activities by DIBC, reimbursement for costs associated with contractual breaches of the parties' agreements, an order of specific performance to direct DIBC to engage in construction consistent with the agreement, damages incurred as a result of DIBC's actions, and any other appropriate equitable and monetary relief.

On October 29, 2009, MDOT filed a motion for partial summary disposition pursuant to MCR 2.116(C)(10), seeking a partial judgment ordering DIBC to construct the two-lane access road for the project. Two weeks later, on November 13, 2009, MDOT filed a second motion for partial summary disposition and an order for specific performance pursuant to MCR 2.116(C)(10), seeking a partial judgment ordering DIBC to construct the necessary roads, ramps, and bridges to connect the I-75 and I-96 freeways directly to the Ambassador Bridge in accordance with the agreed-upon design for those structures. In response to these motions, DIBC essentially argued that the parties had developed a "flexible" plan, that they had merely committed to a

"design concept," and that they did not memorialize
any particular plan or agreement regarding the design
or construction of particular roads, structures, or im-
provements. DIBC submitted the affidavit of Stamper
to support its assertion that there was never "an
immutable, final, agreed set of plans."

On February 1, 2010, the trial court issued an opin-
ion and order granting both motions and granting
MDOT's request for specific performance. The trial
court found that MDOT and DIBC had "agreed on a
design for DIBC's Part A of the project," as reflected in
the agreements and incorporated into the performance
bond, and that DIBC had not constructed Part A
according to the agreed-upon design. In doing so, the
trial court rejected DIBC's arguments that it was not
restricted by the contract to a particular design and
that it could unilaterally substitute different access
routes. The trial court further noted that "DIBC ha[d]
constructed permanent structures and facilities in con-
flict with the designs for the easement, road and
ramps." Accordingly, the trial court directed DIBC,
among other things, to "remove structures that have
been constructed in the path of the access road and
recorded easement and complete construction of its
portion of the Gateway Project in accordance with the
plans attached to the Performance Bond and the Main-
tenance Agreement."

On February 19, 2010, DIBC filed an emergency
application seeking leave to appeal the court's opinion
and order granting partial summary disposition, along
with motions for immediate consideration and for a stay
of the order. This Court denied DIBC's interlocutory
application for leave to appeal "for failure to persuade
the Court of the need for immediate appellate review"
and denied the motion for a stay. *Dep't of Transp v*

*Detroit Int'l Bridge Co,* unpublished order of the Court of Appeals, entered March 17, 2010 (Docket No. 296567).

DIBC then filed a motion in the trial court seeking revisions, clarification, and amendment of the order because the order did not address the issue of material and nonmaterial changes. DIBC claimed that MDOT's approval was not needed for nonmaterial changes. At a hearing conducted on April 23, 2010, the trial court ruled that its order was enforceable, that a timetable for the completion of construction submitted by DIBC was unsatisfactory, and that DIBC's motion for revision, clarification, and amendment was frivolous.

Four days later, the trial court issued an order to show cause, directing DIBC and Stamper to appear in court on May 10, 2010, to explain why DIBC should not be held in civil contempt for failing to comply with the terms of the February 1, 2010, opinion and order. On the same day, DIBC filed an application with the Supreme Court, as well as a motion for a stay and a motion for immediate consideration, seeking leave to appeal this Court's denial of its application for leave to appeal filed in Docket No. 296567. The Supreme Court initially granted a stay, but subsequently denied DIBC's application for leave to appeal and vacated the stay. *Dep't of Transp v Detroit Int'l Bridge Co,* 486 Mich 937 (2010).

The trial court rescheduled the show-cause hearing for June 10, 2010, and then for September 23, 2010, but as a result of DIBC's attempt to remove the lawsuit to federal district court, each hearing was adjourned. The trial court was finally able to conduct the show-cause hearing in December 2010, over the course of three days. Stamper appeared and testified at the hearing. On January 10, 2011, the trial court ruled that it was

finding by clear and unequivocal evidence that (1) DIBC was not complying with the terms and provisions of the February 1, 2010, order, (2) the failure to comply impaired the authority and impeded the functioning of the court, (3) DIBC's acts and omissions occurred outside of the presence of the court, and (4) DIBC was in civil contempt. The trial court found that the timetable submitted by DIBC, which provided a completion date in June 2013, was completely unacceptable, especially given that at least 60 to 70 percent of the work had been completed, and directed DIBC to submit a detailed timetable that would ensure full compliance with the February 1, 2010, order within one year. The trial court also directed DIBC to submit biweekly reports regarding all scheduled work and work in progress. The trial court further ordered that Stamper be imprisoned in the Wayne County jail until DIBC began to comply with the February 1, 2010, order. Stamper was released later in the day once it was reported to the trial court that DIBC was beginning to comply with the order to remove the structures.

DIBC again filed an application seeking leave to appeal the February 1, 2010, opinion and order as well as the January 10, 2011, contempt order. This Court denied DIBC's interlocutory application "for failure to persuade the Court of the need for immediate appellate review" and denied the motion for a stay. *Dep't of Transp v Detroit Int'l Bridge Co*, unpublished order of the Court of Appeals, entered March 18, 2011 (Docket No. 302330). DIBC did not seek leave to appeal in the Supreme Court.

In June 2011, MDOT filed an ex parte motion for continuation of contempt proceedings under MCR 3.606(A) because of DIBC's continuing violation of the court's February 1, 2010, opinion and order. In its

motion, MDOT claimed that DIBC had not removed any conflicting structures and had not constructed any public roads, as ordered by the court. MDOT submitted an affidavit supporting the motion. On June 13, 2011, the trial court issued a show-cause order directing Stamper and DIBC to personally appear and show cause why DIBC should not be held in civil contempt for failure to comply with the terms and provisions of the February 1, 2010, opinion and order. DIBC's resident agent was served with the order. Stamper was also personally served with the order, appeared at the hearing as directed, and provided testimony in defense of the civil contempt charge against DIBC at subsequent hearings conducted in September and October 2011.

The trial court issued an opinion and order on November 3, 2011, in which it found by clear and unequivocal evidence that DIBC was in violation of the February 1, 2010, order, and therefore ruled that DIBC was, again, in civil contempt of the court. The trial court stated that the project site plan that was illustrated in the C-1 drawing "identifies the major components" of the Gateway Agreement and that DIBC was responsible for constructing "various components" shown in the C-1 drawing, which included the S01 Bridge for outbound traffic to Canada and the "4/3 lane" road under the S01 Bridge. After describing the factual background and previous proceedings in this case, the court summarized the testimony from the hearing and then set forth the following findings of fact:

> DIBC has provided plans for construction and has constructed parts of a design that is not in agreement with the approved design. DIBC's request for a variance for the alternate design has been denied by MDOT. The proposed substitute design materially changes the approved design. The proposed construction plans leave out important parts of the approved design including the two-lane access road

and special return routes shown on the C-1 drawing and the Maintenance Agreement. Additionally, DIBC has not removed various conflicting structures that are in the path of roads shown in the approved design.

The C-1 drawing in Exhibit E to the Performance Bond required DIBC to construct a four lane road that proceeds in a southerly direction under [the] S01 [ramp] and between its piers. The C-1 drawing shows the four lanes making a turn to the west, paralleling Fort Street and then narrowing to three lanes. The as-built plans submitted by DIBC, show that piers of S01 (piers 11, 12, and 13) are in conflict with the four lane road that passes under S01. DIBC did not submit preliminary and final construction plans to MDOT for approval, prior to the start of construction of S01 as required by the Gateway Agreement. DIBC constructed a two lane road that proceeds in a southerly direction under S01 between the piers conflicting with the C-1 drawing. Cars using those two lanes may stop for fueling, stop at the duty free store or proceed to S01. Truck traffic is routed in a southwesterly direction at pier 11, through newly constructed toll booths toward a truck fueling area. The car fueling area is in the path of the 4/3 lane road shown in C-1. S01 as presently constructed, is not in compliance with the February 1, 2010 Order of this Court. Mr. [Thomas] LaCross[, an engineer serving as project manager for the Ambassador Bridge Gateway project on behalf of DIBC,] and Mr. [Michael] Anderson[, an engineer employed by a security firm representing Safeco,] acknowledged that S01 was not constructed in conformity with C-1 of Exhibit E to the Performance Bond.

DIBC has sought approval for variances, including approval for nonconforming as-built plans for S01 from MDOT; however, those requests have not been approved. DIBC has not submitted construction plans that satisfy the requirements of the plans attached to the Performance Bond and the Maintenance Agreement for the access road and the truck road. The truck road from Canada is a two lane road that carries truck traffic in a westerly direction, parallel to Fort Street. The truck road continues to the S02 Bridge to S32 to convey truck traffic onto the freeways.

Pier 19 conflicts with the proposed truck road. Plans have not been submitted for the correction of piers 11, 12, 13 and the relocation of pier 19.

With respect to sanctions, the trial court listed options it was considering to coerce compliance with the February 1, 2010, order: (1) requiring DIBC's surety, Safeco, to take over responsibility for completing the project, (2) having MDOT or another construction company complete DIBC's portion of the project, (3) *financial sanctions or imprisonment, or both*, and (4) appointment of a receiver to stand in the place of the owner of DIBC (Moroun, according to the court) and its officers with authority to make decisions regarding the implementation of the February 1, 2010, order. The trial court indicated that it would make this sanction determination at a hearing on January 12, 2012, and directed DIBC in the interim to remove conflicting structures and perform construction in accordance with the C-1 drawing. The trial court also directed Moroun and "the top company officer for DIBC" to appear before the court on January 12, 2012, on the sanctions issue.

DIBC filed an application seeking leave to appeal the November 3, 2011, order and a motion for immediate consideration. This Court denied the interlocutory application "for failure to persuade the Court of the need for immediate appellate review" and denied the motion for a stay. *Dep't of Transp v Detroit Int'l Bridge Co*, unpublished order of the Court of Appeals, entered January 10, 2012 (Docket No. 307306).

In the meantime, Moroun filed a motion to be excused from appearing at the January 12, 2012, hearing. Moroun's motion stated that it was intended to inform the trial court that he was not the owner of DIBC and that he was not the decision-maker with respect to the Gateway Project, and further asserted:

> Mr. Moroun is not the owner of DIBC. DIBC is owned by
> DIBC Holdings, Inc. ("DIBC Holdings"). The Manuel J.
> Moroun Trust Dated March 24, 1977 As Amended and
> Restated on August 28, 1996 is a minority owner of DIBC
> Holdings. Mr. Moroun is a member of DIBC's board of
> directors, and he has not been a statutory officer of DIBC
> during any pertinent time. While Mr. Moroun has been
> informed about the Ambassador Bridge Gateway Project
> ("Gateway Project") and this Court's order regarding the
> Gateway Project, from the inception, authority over the
> Gateway Project – and subsequently this litigation – has
> been the responsibility of Dan Stamper, DIBC's president
> for over 20 years.

MDOT filed a response to the motion, asserting that
Moroun should not be excused from the hearing regard-
ing sanctions for the contempt order because he was a
director and owner of DIBC Holdings, Inc., which is the
sole owner of DIBC and DIBC was under the trial
court's authority and jurisdiction. MDOT also asserted
that Moroun and Stamper were directors of DIBC and
that they constituted a majority in control of DIBC.
MDOT also pointed out that Stamper had testified at
the show-cause hearing that he reported to the board of
directors, which included Moroun.

The parties, and appellants, along with their attor-
neys, appeared at the hearing conducted on January 12,
2012. In denying Moroun's motion to be excused, the
trial court stated:

> In addition, the claim that Manuel Moroun has no
> control or authority is not supported by the record of this
> case. Mr. Moroun has the power, the authority to make sure
> that there is compliance with the February 1st, 2010 Order
> of this Court. The request to excuse Mr. Moroun from this
> hearing is therefore denied.

After discussing several options for sanctions, the trial
court stated that DIBC "is best equipped to complete

the project at this time" because it has the power, the resources, and the knowledge to comply with the court's order, and that the "key decision makers," who were Manuel Moroun, Stamper, and Matthew Moroun (Manuel Moroun's son and the vice president of DIBC), had the responsibility to ensure that DIBC fully complied with the order. The trial court then directed DIBC to pay the maximum fine of $7,500 and MDOT's costs and reasonable attorney fees and directed that appellants be imprisoned in the Wayne County jail until DIBC complied with the court's February 1, 2010, order. The trial court also entered an opinion and order incorporating these rulings. In relevant part, the order provides:

> IT IS ORDERED THAT Manuel "Matty" Moroun and Dan Stamper shall be imprisoned in the Wayne County Jail until the Detroit International Bridge Company complies with the February 1, 2010 Order of this Court.
>
> IT IS ORDERED THAT the imprisonment of Manuel "Matty" Moroun and Dan Stamper shall cease when the Detroit International Bridge Company has fully complied with the February 1, 2010 Order of this Court or they no longer have the power to comply with the February 1, 2010 Order of this Court.

Finally, the trial court continued the matter to February 9, 2012, "for further review of the status of the project and the appearance of the Vice President of DIBC, Matthew Moroun."

Appellants filed a claim of appeal, along with a motion for release pending appeal. This Court denied the latter on January 12, 2012. The following day, appellants filed motions for peremptory reversal, for a stay, and for immediate consideration. This Court denied the motion for peremptory reversal, but granted, in part, the motion for a stay, releasing appellants until further order of this Court. This Court also expedited

the appeal by shortening the briefing schedule and scheduling the matter for oral argument on February 2, 2012.

II. JURISDICTION

Appellants claim that their appeal is as of right, citing MCR 7.203(A), MCR 7.204, and MCR 7.202(6)(a). MDOT asserts "this Court does *not* have jurisdiction . . . as claimed by both DIBC and its corporate officials, because the January 12, 2012 order is not a final order appealable by right." MDOT makes no further argument, however, believing that "[i]t appears this Court has treated the corporate officials' claim of appeal as an application for leave to appeal under MCR 7.203(B) the January 12, 2012 Opinion and Order, and granted it." We clarify that we have not treated this appeal as on application for leave to appeal; instead, we conclude that appellants may appeal as of right.

In this case, DIBC, a party to the underlying lawsuit, was held in *civil* contempt of court, which must be distinguished from *criminal* contempt; whereas the former is coercive, the latter is punitive. *In re Contempt of Dougherty*, 429 Mich 81, 95; 413 NW2d 393 (1987). Criminal contempt is a crime and, therefore, an order finding a party in criminal contempt of court and sanctioning the party is a final order from which the contemnor may appeal as of right. See MCL 600.308(1); MCR 7.203(A); MCR 7.202(6)(b); *In re Contempt of Dudzinski*, 257 Mich App 96, 97; 667 NW2d 68 (2003); *In re Contempt of Robertson*, 209 Mich App 433, 436; 531 NW2d 763 (1995). However, an order finding a party in civil contempt of court is not a final order for purposes of appellate review. See MCL 600.308(2); MCR 7.202(6)(a).

Civil contempt is clearly at issue in this case because the trial court sought to compel DIBC's compliance with its February 1, 2010, order. Thus, an appeal by DIBC of the civil contempt order entered on November 3, 2011, must be made by application, not as of right. However, the same is not true for the individual appellants, Moroun and Stamper, who are nonparties who have not been held in contempt but instead have been sanctioned for DIBC's contempt. Even if a final order against DIBC had been issued, appellants would not have the ability to appeal as of right under MCR 7.203(A) because they do not have party status. Thus, limiting appellants to only seeking leave to appeal by application would be tantamount to denying them the right to appellate review of the trial court's imposition of sanctions. We do not believe an individual's right to appellate review should be so constrained, especially in this context, in which the most severe sanction—incarceration—is used to coerce compliance with a trial court's order.

Under federal law, "[t]he right of a nonparty to appeal an adjudication of contempt cannot be questioned" even absent a final order. *United States Catholic Conference v Abortion Rights Mobilization, Inc*, 487 US 72, 76; 108 S Ct 2268; 101 L Ed 2d 69 (1988) (in the context of finding a witness in contempt). We have also previously treated an appeal from nonparties held in civil contempt of court as an appeal by right, though the issue was never specifically raised or discussed. See, e.g., *Droomers v Parnell*, unpublished opinion per curiam of the Court of Appeals, issued June 30, 2005 (Docket No. 253455) (nonparty officers of a corporation); *In re Radulovich*, unpublished opinion per curiam of the Court of Appeals, issued April 10, 2001 (Docket No. 210779) (attorney who represented a party in an underlying matter). Although appellants have not been

held in contempt, but sanctioned as decision-makers to enforce DBIC's compliance with the court's order, we conclude that the same principles apply. This matter is properly before us by means of a claim of appeal.

### III. DUE PROCESS

Appellants contend that they were not afforded due process because they were never put on notice that they were in jeopardy of being imprisoned as a result of DIBC's civil contempt. We disagree. Whether a person has been afforded due process is a question of law that is reviewed de novo. *In re Contempt of Henry*, 282 Mich App 656, 668; 765 NW2d 44 (2009).

A trial court has inherent and statutory authority to enforce its orders. MCL 600.611; MCL 600.1711; MCL 600.1715. In civil contempt proceedings, a trial court employs its contempt power to coerce compliance with a present or future obligation, including compliance with a court order, to reimburse the complainant for costs incurred as a result of contemptuous behavior, or both. *Porter v Porter*, 285 Mich App 450, 455; 776 NW2d 377 (2009). "Civil contempt proceedings seek compliance through the imposition of sanctions of indefinite duration, terminable upon the contemnor's compliance or inability to comply." *DeGeorge v Warheit*, 276 Mich App 587, 592; 741 NW2d 384 (2007).

The trial court must carry out the proper procedures before it can issue an order holding a party or individual in contempt of court. *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 711; 624 NW2d 443 (2000). As opposed to a criminal contempt proceeding, in which some, but not all, of the due-process safeguards of an ordinary criminal trial are used, a civil contempt proceeding only requires "rudimentary" due process, i.e., "notice and an opportunity to present a defense . . . ."

*Porter*, 285 Mich App at 456-457; see also *Int'l Union, United Mine Workers of America v Bagwell*, 512 US 821, 831; 114 S Ct 2552; 129 L Ed 2d 642 (1994) ("Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required.").

Appellants assert that they are not DIBC and that "the fiction" underlying the trial court's January 12, 2012, order is that they are "tantamount to DIBC" and "stand in its place vis a vis the contempt proceedings." They also cite caselaw supporting the proposition that a corporation is a separate entity from its individual shareholders, officers, and directors. However, appellants have overlooked that a corporation can only act through its officers and agents. See *In re Kennison Sales & Engineering Co, Inc*, 363 Mich 612, 617; 110 NW2d 579 (1961), quoting *Stowe v Wolverine Metal Specialties Co*, 242 Mich 624, 628; 219 NW 714 (1928). " 'When a court acquires jurisdiction over a corporation as a party, it obtains jurisdiction over the official conduct of the corporate officers so far as the conduct may be involved in the remedy against the corporation which the court is called upon to enforce.' " *Stowe*, 242 Mich at 629, quoting *Tolleson v People's Savings Bank*, 85 Ga 171; 11 SE 599 (1890). Courts will also disregard the separate existence of corporate entities when it is "used to defeat public convenience, justify wrong, protect fraud, or defend crime . . . ." *Paul v Univ Motor Sales Co*, 283 Mich 587, 602; 278 NW 714 (1938).

Because individuals who are officially responsible for the conduct of a corporation's affairs are required to obey a court order directed at the corporation, these same individuals may be sanctioned if they fail to take appropriate action within their power to ensure that the corporation complies with the court order. *Wilson v*

*United States*, 221 US 361, 376; 31 S Ct 538; 55 L Ed 771 (1911). In *Wilson*, the United States Supreme Court stated:

> A command to [a] corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt. [*Id.*]

See also *Electrical Workers Pension Trust Fund of Local Union 58, IBEW v Gary's Electrical Serv Co*, 340 F3d 373, 380 (CA 6, 2003), and *Ex parte Chambers*, 898 SW2d 257, 260 (Tex, 1995). Accordingly, we reject appellants argument that they may not be held accountable for failing to ensure DIBC's compliance with the trial court's order.

Appellants further argue that they were not given notice to show cause why they should not be personally sanctioned, or given an opportunity to be heard, in violation of the United States and Michigan Constitutions and the notice requirements of MCL 600.1711(2) and MCR 3.606(A). When the contempt is committed outside the court's direct view (i.e., "indirect contempt"), as in this case, MCL 600.1711(2) allows a trial court to punish the contemnor by fine or imprisonment, or both, "after proof of the facts charged has been made by affidavit or other method and opportunity has been given to defend." For indirect contempt, the trial court must also comply with MCR 3.606(A), which, on a proper showing on ex parte motion supported by affidavits, requires the trial court to (1) order the accused person to show cause, at a reasonable time specified in the order, why that person should not be punished for the alleged misconduct or (2) issue a bench warrant for the arrest of the person.

Appellants' citation of *Auto Club*, 243 Mich App 697, as support for their argument that the trial court was required to name them in the show-cause order is not persuasive. *Auto Club* is distinguishable because the persons accused of contempt, the attorneys, were capable of committing the contemptuous acts on their own, whereas a corporation cannot act on its own, contemptuously or otherwise. Rather, as previously noted, a corporation can only act through its officers and agents. Appellants were responsible for ensuring DIBC's compliance with the February 1, 2010, opinion and order, regardless of whether they were parties to the underlying litigation or whether they were named in the trial court's opinion and order. The trial court held DIBC in civil contempt. The trial court found that appellants were the key decision-makers at DIBC, with the responsibility to ensure that DIBC complied with the court's order. Contrary to their claim on appeal, there is sufficient evidence in the record to support this finding.

With respect to Moroun, he represented that he is a director of DIBC and that his trust is a minority shareholder in DIBC Holdings, which owns DIBC. Moreover, Moroun does not dispute that his living trust holds the majority of voting shares in DIBC Holdings. Moroun also acknowledged that he had been informed about the Gateway Project and the court's order regarding the Gateway Project, but claimed that authority over the Gateway Project and the litigation "has been the responsibility of Dan Stamper." He did not otherwise affirmatively assert that he had no authority or responsibility over DIBC or its affairs, and any such assertion would not have been credible.

Furthermore, the November 3, 2011, opinion and order finding DIBC in contempt affirmatively discussed

the possible civil contempt sanctions, including imprisonment, and directed Moroun to appear at the sanction hearing. Moroun filed a motion to be excused from the hearing, which, from our perspective, was an attempt to avoid the possibility that he might be sanctioned for DIBC's civil contempt. Accordingly, we conclude that Moroun was provided notice that he might be sanctioned for DIBC's contempt and an opportunity to be heard on the matter.

With respect to Stamper, he was listed on the show-cause order, was present throughout the contempt hearings, and actively participated in DIBC's defense. He had also previously been imprisoned for DIBC's civil contempt in January 2011. Because there is no dispute regarding Stamper's authority over the company and the project, we conclude that he had notice that he might be incarcerated as a coercive sanction for DIBC's civil contempt and was provided an opportunity to be heard on the matter.

## IV. IMPRISONMENT SANCTION

Appellants argue that their imprisonment was an improper use of the civil contempt power and was invalid as a matter of law because the trial court's order did not give them the "keys to their cell[s]." We disagree with appellants to the extent that they argue that incarceration was an improper use of the trial court's civil contempt power; however, we agree with appellants that the trial court erred by requiring their continued incarceration until DIBC "fully complied with" the February 1, 2010, order. We review a trial court's issuance of a contempt order for an abuse of discretion and the factual findings supporting the order for clear error. *Porter*, 285 Mich App at 454-455. "[R]eversal is warranted only when the trial court's decision

is outside the range of principled outcomes." *Id.* at 455. To the extent that this Court must examine questions of law related to the trial court's contempt decision, our review is de novo. See *DeGeorge*, 276 Mich App at 591. The interpretation and application of the court rules and statutes are also reviewed de novo. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

Confinement or imprisonment may be imposed whether the contempt is civil or criminal in nature. *Borden v Borden*, 67 Mich App 45, 48; 239 NW2d 757 (1976). In the civil context, the confinement must be conditional. See MCL 600.1715.

> The critical feature that determines whether the remedy is civil or criminal in nature is not when or whether the contemnor is physically required to set foot in a jail but whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order. [*Hicks ex rel Feiock v Feiock*, 485 US 624, 635 n 7; 108 S Ct 1423; 99 L Ed 2d 721 (1988).]

Civil contempt imposes a term of imprisonment that ceases when the contemnor complies with the court's order or when it is no longer within his or her power to comply. *Borden*, 67 Mich App at 48. MCL 600.1715 provides:

> (1) Except as otherwise provided by law, punishment for contempt may be a fine of not more than $7,500.00, or imprisonment which, except in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform shall not exceed 93 days, or both, in the discretion of the court. . . .
>
> (2) If the contempt consists of the omission to perform some act or duty that is still within the power of the person to perform, *the imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty, which shall be specified in the*

*order of commitment*, and pays the fine, costs, and expenses
of the proceedings, which shall be specified in the order of
commitment. [Emphasis added.]

When the purpose of the sanction is to make a party
or person comply, the trial court, in exercising its
discretion, must " 'consider the character and magni-
tude of the harm threatened by continued contumacy,
and the probable effectiveness of any suggested sanc-
tion in bringing about the result desired.' " *Dougherty*,
429 Mich at 98, quoting *United States v United Mine
Workers of America*, 330 US 258, 304; 67 S Ct 677; 91 L
Ed 884 (1947). Clearly, the trial court considered the
effectiveness of other sanctions before choosing incar-
ceration to coerce compliance with its order, and pro-
vided the following reasons for rejecting other alterna-
tives that MDOT suggested:

One of the options considered was to require DIBC's
surety Safeco to take over the responsibility for completing
the project. A default has been taken against Safeco.
However, even without the default, Safeco as surety is
liable for the responsibilities of its principle [sic] DIBC,
which includes completing the project and monetary dam-
ages. On July 8, 2011, Safeco was ordered to submit a
detailed plan that may be implemented to complete DIBC's
portion of the Gateway Project. MDOT as well as DIBC
were given an opportunity to respond to Safeco's plan. A
fair review of the information submitted by the parties in
response to Safeco's plan makes it clear that this project
would be bogged down with further litigation in addition to
needless delays if Safeco was ordered to take on the
construction at this time. Requiring Safeco to take on the
construction obligations of DIBC is not the best option
available at this time.

The use of an independent contractor to complete
DIBC's portion of the project would also be challenging.
There are funding considerations, oversight concerns,
probable litigation, as well the contractor's need to assess

the construction requirements which could prove to be a formidable task for a contractor new to the project. The contractor would be required to arrange for the completion of construction drawings for review and approval by MDOT. The assessment and coordination of the construction needed would require interaction with other entities resulting in further delays. The use of an independent contractor would further delay the completion of the project and would therefore not be the best option to use to complete the project.

The use of a receiver would likely produce many of the same problems as those anticipated by the use of an independent contractor. At the Court's direction, the parties presented briefs discussing their positions regarding the appointment of a receiver. In addition, a hearing was conducted on December 1, 2011, at which time representatives from MDOT, DIBC, and Safeco were allowed to make oral presentations. Based on the information that has been presented, it appears that the appointment of a receiver at this time would generate a number of issues resulting in additional delays. There are funding issues that would likely bring about additional litigation and delays. There are also the concomitant problems of safeguarding the funds and coordinating construction activities. The receiver would be required to hire design consultants, develop plans for approval by MDOT and obtain bids for construction contracts. Appointing a receiver at this time would likely greatly prolong the time required for the completion of the project. The appointment of a receiver at this time would not be the best option to complete this project.

The trial court further found that DIBC had the power, resources, and knowledge to complete its portion of the project in accordance with the February 1, 2010, order and that the decision-makers of DIBC did not intend to carry out construction of its portion of the project in conformity with the February 1, 2010, order unless the court imposed "meaningful coercive measures." We cannot say that the trial court's decision to use coercive

measures, including incarceration, over other alternatives fell outside the range of principled outcomes or that the decision constituted an abuse of discretion.[2]

As previously noted, the trial court's January 12, 2012, order provides the following with respect to appellants' conditional imprisonment:

> IT IS ORDERED THAT Manuel "Matty" Moroun and Dan Stamper shall be imprisoned in the Wayne County Jail until the Detroit International Bridge Company complies with the February 1, 2010 Order of this Court.
>
> IT IS ORDERED THAT the imprisonment of Manuel "Matty" Moroun and Dan Stamper shall cease when the Detroit International Bridge Company has fully complied with the February 1, 2010 Order of this Court or they no longer have the power to comply with the February 1, 2010 Order of this Court.

Because the purpose of civil contempt is to enforce compliance with an order, rather than to punish for disobedience, the contemnor may not be incarcerated beyond the time that he or she is able to comply with the court's order. *People v Kearns*, 38 Mich App 561, 563; 196 NW2d 805 (1972), quoting *Spalter v Wayne Circuit Judge*, 35 Mich App 156, 161; 192 NW2d 347 (1971). "Civil contempt seeks to coerce compliance, to coerce [the contemnor] to do what he is able to do but refuses to do." *Borden*, 67 Mich App at 48. In other words, the contemnor "carries the keys to his prison in

---

[2] While it is clear that appellants take issue with the order, nevertheless, appellants are not at liberty to disregard the order on the basis of their subjective belief that it was wrong. *Porter*, 285 Mich App 465. "A party must obey an order entered by a court with proper jurisdiction, even if the order is clearly incorrect, or the party must face the risk of being held in contempt and possibly being ordered to comply with the order at a later date." *Kirby v Mich High Sch Athletic Ass'n*, 459 Mich 23, 40; 585 NW2d 290 (1998); see also *Henry*, 282 Mich App at 680.

his own pocket." *Id.* In *Bagwell*, 512 US at 828, the Supreme Court further explained:

> The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance. Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus, carries the keys of his prison in his own pocket. [Quotation marks and citations omitted.]

We cannot uphold the trial court's commitment order when the condition for release requires DIBC to "fully" comply with the February 1, 2010, order because it failed to identify "the act or duty" that must be performed before the incarceration may be terminated. MCL 600.1715(2). While appellants might have the present ability to commence and continue construction, they do not have the present ability to actually finish the construction in accordance with the directives set forth in the February 1, 2010, opinion and order for a period of 6 to 12 months. Therefore, the condition does not permit appellants to use the keys to obtain their release until the project is completed. In other words, appellants may not immediately "avoid the sentence," or purge the contempt, by complying with the terms of the original order. *Hicks*, 485 US at 635 n 7. Our decision does not preclude further civil contempt sanctions, including imprisonment under terms similar to those imposed by the trial court in January 2011. However, we leave this decision to the discretion of the trial court. If the trial court orders further sanctions to coerce

the initiation and continuation of compliance with its February 1, 2010, order, it must do so within the confines of the caselaw and MCL 600.1715 by identifying the act or duty appellants will be required to perform in order to purge the contempt.

## V. JUDICIAL DISQUALIFICATION

Finally, appellants argue that further proceedings should be held before a different judge because the judge acted as both accuser and finder of fact and has become personally embroiled in the litigation. There has been no motion to disqualify the judge; therefore, there is no ruling for us to review. See *Henry*, 282 Mich App at 679, citing MCR 2.003. We further conclude that there is no merit to appellants' position that the judge acted as an accuser and finder of fact by imposing a sanction that was not requested by MDOT. The judge provided an adequate explanation of why other alternatives would not bring about compliance with the order.

## VI. CONCLUSION

Accordingly, we conclude that appellants properly appealed as of right because a nonparty individual sanctioned to enforce compliance with a civil contempt order directed at a party must be permitted to appeal even in the absence of a final order. We further conclude that appellants were afforded rudimentary due process, but the conditional confinement did not allow appellants to avoid the sentence by purging the contempt. Therefore, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. In light of the trial court's scheduled February 9, 2012, hearing, we give our judgment immediate effect. MCR 7.215(F)(2).

WILDER, P.J. (*concurring in part and dissenting in part*).

I

I agree that this Court has jurisdiction of the claim of appeal filed in this action by appellants Manuel J. Moroun and Dan Stamper for the reason that, as they are nonparties to the underlying action by the Michigan Department of Transportation (MDOT) against the Detroit International Bridge Company (DIBC), the order that punished Moroun and Stamper for the civil contempt of DIBC is a final order appealable by right. MCR 7.202(6)(a)(i); *US Catholic Conference v Abortion Rights Mobilization, Inc*, 487 US 72, 76; 108 S Ct 2268; 101 L Ed 2d 69 (1988).

II

Additionally, I agree that the trial court's January 12, 2012, order did not specify with particularity what action or actions Stamper and Moroun were required to take so that they were able to immediately purge themselves of the contempt finding made by the trial court against DIBC. First, no contempt finding was made against Moroun and Stamper. Only DIBC was found in contempt. Thus, any act to be performed by Moroun and Stamper was not to purge themselves of contempt for some unstated act in defiance of the trial court's order, but instead was to purge DIBC of contempt. Second, there is considerable ambiguity with regard to what the trial court intended by requiring Moroun and Stamper to remain imprisoned until DIBC had "fully complied" with the trial court's February 1, 2010, order. In this regard, counsel for MDOT acknowledged during oral argument before this Court that it was unclear precisely what particular actions by Moroun and Stamper would satisfy the trial court's

directive that DIBC fully comply with the February 1, 2010, order. Moreover, the trial court had appointed a monitor to oversee and report on the project's progress and had also ordered DIBC to file biweekly progress reports. But, as also acknowledged by counsel for MDOT, it is unclear to what extent the trial court's review of the reports would affect its determination whether DIBC had sufficiently complied with the February 1, 2010, order, so that Moroun and Stamper could be determined to have done enough to have purged DIBC of contempt.[1] For these reasons, I agree that the commitment directive did not enable appellants "to purge the contempt and obtain [their] release by committing an affirmative act," or in other words, appellants did not carry "the keys of [their] prison in [their] own pocket[s]."[2] *Int'l Union, United Mine Workers of America v Bagwell*, 512 US 821, 828; 114 S Ct 2552; 129 L Ed 2d 642 (1994) (quotation marks and citations omitted).

III

I disagree, however, with the conclusion in the lead opinion that there was sufficient notice to Moroun and Stamper.

---

[1] Having seen no order that seals any part of the court record (there might be valid reasons to seal aspects of the record, such as to protect proprietary information, or for matters of public safety or national border security, but no such finding has been made), I am unaware of the reason why these reports, reviewed and presumably considered by the trial court in its deliberations, should not be docketed in the register of actions and available in the court record transmitted to this Court pursuant to MCR 7.210(G).

[2] Pertinent to this point, during oral argument, counsel for Moroun and Stamper represented to this Court that every day from January 13, 2012, to February 1, 2012, Stamper had presented new engineering plans, from a new engineering firm, to the court-appointed monitor in an effort to comply with the trial court's February 1, 2010, order, but the monitor had refused to examine the plans.

A

There is no question that officers and agents of a corporation are bound to follow orders that are directed toward the corporation, even if those officers and agents are not named in the order itself. See *In re Kennison Sales & Engineering Co*, 363 Mich 612, 618; 110 NW2d 579 (1961); *Ex parte Chambers*, 898 SW2d 257, 260 (Tex, 1995). Thus, Stamper as president of DIBC and Moroun as a director of DIBC were bound by the orders of the trial court directing certain action by DIBC, and they were required to avoid conduct that contributed to or caused DIBC to violate the trial court's February 1, 2010, order. From the fact that the trial court ordered them incarcerated, it is clear that the trial court concluded that Moroun and Stamper did or failed to do something that contributed to or caused the contumacious conduct of DIBC.[3] However, the June 9, 2011, ex parte motion filed by MDOT, the trial court's June 13, 2011, order to show cause, and the show-cause proceedings commenced on July 7, 2011, did not identify what conduct of Moroun and Stamper contributed to or caused DIBC to be in contempt of the trial court's February 1, 2010, order. In addition, the show-cause order did not make Moroun and Stamper parties to the contumacious conduct of DIBC. I would conclude that these are due-process errors that require the trial court's sanctions against Moroun and Stamper to be vacated.

---

[3] I acknowledge Moroun and Stamper's argument that if an appellate court agrees with DIBC's contention that it is not in violation of the executory contract between it and MDOT, on the basis that it agreed to a design concept for the project and never reached "an immutable, final, agreed set of plans" with MDOT, the appellate court might also conclude that DIBC's conduct was not contumacious. However, because the February 1, 2010, order was not a final order, MCR 7.202(6)(a)(i), that issue is not before us.

B

1

In a civil contempt proceeding, "rudimentary" due process is required. *Porter v Porter*, 285 Mich App 450, 456-457; 776 NW2d 377 (2009). Specifically, this requires "notice and an opportunity to present a defense, and the party seeking enforcement of the court's order bears the burden of proving by a preponderance of the evidence that the order was violated." *Id.* at 457.

MCL 600.1711(2), addressing indirect contempt, provides that "[w]hen any contempt is committed other than in the immediate view and presence of the court, the court may punish it by fine or imprisonment, or both, after proof of the facts charged has been made by affidavit or other method and opportunity has been given to defend."

MCR 3.606(A)(1), also governing contempt outside of the immediate presence of the court, provides in part that the court shall "order the *accused person* to show cause, at a reasonable time specified in the order, why *that person* should not be *punished* for the alleged misconduct." (Emphasis added.)

Accordingly,

[i]f the contemptuous behavior occurs in front of the court, i.e., it is "direct" contempt, there is no need for a separate hearing before the court imposes any proper sanctions because "all facts necessary to a finding of contempt are within the personal knowledge of the judge." If the contemptuous conduct occurs outside the court's direct view, i.e., it is "indirect" contempt, the court must hold a hearing to determine whether the alleged contemnor actually committed contempt. This hearing must follow the procedures established in MCR 3.606 and afford some measure of due process before the court can determine whether there is sufficient evidence of contempt to warrant sanctions. [*In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 712-713; 624 NW2d 443 (2000) (citations omitted).]

2

This Court interprets court rules according to the same principles that govern the interpretation of statutes. *Ligons v Crittenton Hosp*, 490 Mich 61, 70; 803 NW2d 271 (2011). "Our goal when interpreting and applying statutes or court rules is to give effect to the plain meaning of the text. If the text is unambiguous, we apply the language as written without construction or interpretation." *Id.* Moreover, if there is any conflict between the requirements of MCL 600.1711(2) and MCR 3.606, the court rule prevails. *In re Contempt of Henry*, 282 Mich App 656, 667; 765 NW2d 44 (2009). A trial court's substantial compliance with MCR 3.606(A)(1) is sufficient. See *People v Saffold*, 465 Mich 268, 273; 631 NW2d 320 (2001).

C

The plain and unambiguous language of MCR 3.606(A)(1) requires that, on a proper showing on an ex parte motion supported by affidavits, *the accused person* should be ordered to show cause why *that person* should not be punished for the alleged contempt. In this case, the ex parte motion, without referring to anyone in particular, asserted that "DIBC" did certain acts or failed to perform certain acts. Also, the June 13, 2011, order to show cause stated the following:

> To: Dan Stamper, President
> Detroit International Bridge Company
>
> YOU ARE ORDERED to personally appear before this Court . . . on Thursday, July 7, 2011 at 9:00 a.m. and show cause why *the Detroit International Bridge Company* should not be held in civil contempt for failure to comply with the terms and provisions of this Court's February 1, 2010 Opinion and Order. [Emphasis added.]

The show-cause order and the averments in the ex parte affidavit were insufficient to comply or substantially comply with the requirement that Moroun and Stamper be given notice that they personally could be punished because the documents pertained to DIBC's compliance with the trial court's February 1, 2010, order. Moroun's and Stamper's conduct was not mentioned in the ex parte affidavit or at the June 9, 2011, hearing pertaining to the ex parte affidavit. In addition, Moroun was not mentioned whatsoever in the show-cause order, and Stamper's identification in the order only directed him to show cause concerning DIBC's conduct. Moreover, when the show-cause proceedings commenced on July 7, 2011, the trial court did not advise Stamper that his personal conduct could be considered contumacious and was a subject of the show-cause hearings, and no statement was made on the record during the show-cause proceedings that Moroun's conduct was the subject of the hearings.[4]

---

[4] See, for example, Michigan Judicial Institute (MJI), Contempt of Court Benchbook (4th ed), Appendix C, p Appx-5, a procedural checklist for conducting civil contempt proceedings, including a pretrial hearing at which the trial court is recommended to, *inter alia*:

☐ Inform the alleged contemnor of the charges.

☐ Inform the alleged contemnor that the charge must be proven by a preponderance of the evidence, or that evidence of the alleged contempt must be "clear and unequivocal."

☐ *Inform the alleged contemnor of the possible sanctions.*

\* \* \*

☐ Ask the alleged contemnor how he or she wishes to plead.

☐ Set date for trial if necessary. The alleged contemnor must be given a reasonable opportunity to prepare a defense or explanation. [Emphasis added; citations omitted.]

While these facts are not in dispute, the lead opinion overlooks these procedural defects by appearing to conclude that, because of Stamper's and Moroun's status as "key decision-makers," i.e., fiduciaries of DIBC, notice that their personal conduct and personal liberty were the subject of the show-cause hearing was obviously implied. But MCR 3.606(A)(1) does not permit constructive notice of the nature of the contempt proceedings and the alleged contumacious conduct—it requires actual notice. In my judgment, the lead opinion's interpretation of MCR 3.606(A)(1) as allowing such constructive notice runs afoul of the plain meaning of the court rule. See *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 758-759; 641 NW2d 567 (2002).

Although there is no precedent directly on point in Michigan, the rationale for interpreting MCR 3.606(A)(1) as requiring all persons subject to a show-cause order, including corporate officers and directors, to be personally notified that they could be subject to punishment for contemptuous conduct is supported by caselaw from other jurisdictions that have addressed this very question. The principle that these other jurisdictions espouse can be summed up as follows: " 'An officer of a corporation who participates in the disobedience of a court mandate is punishable for contempt *provided he has been made a party to the contumacious conduct and due notice has been given to him.'* " *In re Snider Farms, Inc*, 125 BR 993, 999 (Bankr ND Ind, 1991), quoting 17 Am Jur 2d, Contempt, § 61 (emphasis added); see also *Spuncraft, Inc v Lori Jay Mfg Co*, 47 Misc 2d 780, 781; 263 NYS2d 211 (NY Sup Ct, 1965).

In *Dole Fresh Fruit Co v United Banana Co, Inc*, 821

---

Although this MJI Benchbook and checklist are not authoritative, the MJI is a training division of the State Court Administrative Office of the Michigan Supreme Court.

F2d 106 (CA 2, 1987), the district court found three officers of the corporate defendant in civil contempt. The United States Court of Appeals for the Second Circuit reversed, holding that even though the individuals were within the scope of the underlying order, it was improper to hold the individuals in contempt when it appeared that only the corporate defendant was a party to the contempt proceedings. *Id.* at 110. The court stressed that the three individuals did not know that they were "personally" going to be held in contempt. *Id.* This factual situation is nearly identical with the situation in the present case, in which both Stamper and Moroun were never notified that they could be individually punished.[5]

Although the lead opinion does not agree, I would find that *Auto Club*, 243 Mich App 697, does support these principles. In that case, this Court reversed the trial court's finding of contempt against the defendant corporation because the corporation was not afforded notice. *Id.* at 718. The plaintiff instituted contempt proceedings against defense counsel *personally*, not the defendant corporation. *Id.* at 717. But at the conclusion of the show-cause hearing, the trial court found both the attorney *and* the corporation in contempt. *Id.* Thus, this Court concluded that the corporation was "denied

---

[5] The lead opinion suggests that Moroun was provided sufficient notice by virtue of the trial court's November 3, 2011, opinion and order. However, this "notice" was no notice at all. This "notice" occurred *after* the trial court had already conducted the show-cause hearing and found that DIBC was in contempt. If any such notice was to be effective, it had to occur *before* the show-cause hearing in order to allow Moroun "an opportunity to present a defense." *Porter*, 285 Mich App at 457. Indeed, without specific advance notice that the show-cause hearing might result in sanctions imposed against them, any alleged "opportunity to present a defense" available to Moroun and Stamper at the various show-cause hearings was illusory. Who would present a defense without knowing that he or she was being accused?

its right to know the substance of the charges against it." *Id.* This Court further noted:

> The contempt hearing also failed to give [the defendant corporation] notice that *it was being charged with contempt* because the trial court's order appeared to concern [the defense] attorneys as individuals. The first time it became clear that the trial court intended to hold [the corporation] in contempt was in [its] order, after the trial court had already done so. This completely denied [the corporation] an opportunity to prepare or present a defense. [*Id.* (emphasis added).]

Just as the defendant in *Auto Club* was deprived of notice because it was never notified that it could be punished for contempt, the same can be said here of Moroun and Stamper.

D

In summary, I would hold that the unambiguous plain language and meaning of MCR 3.606(A)(1) require that regardless of a person's status as a corporate officer or director of a corporation subject to a show-cause order, that officer or director is entitled to direct rather than implied notice to appear to show cause why *he or she* should not be held in contempt or punished for specified contumacious conduct. Because such notice was not provided in the instant case, I would conclude that the contempt proceedings as they pertain to Moroun and Stamper were fatally flawed as violative of due process of law, and I would vacate the contempt sanctions imposed against them.

IV

Finally, I also dissent from the panel's decision to give this Court's judgment immediate effect pursuant to MCR 7.215(F)(2). The panel has issued three au-

thored opinions concerning the necessary due process of law to be accorded to corporate officials in a show-cause proceeding against a corporation. This issue has not been directly addressed by any Michigan precedent. Under these circumstances, I believe that exceptional issuance of our judgment is unwarranted.

FORT HOOD, J. (*concurring in part and dissenting in part*). I join in and concur with the lead opinion in all respects except concerning the imprisonment sanction.[1] Because I conclude that the trial court did not abuse its discretion with regard to the propriety of the penalty for civil contempt, I would affirm the lower court's decision in its entirety.

Individuals who conspire with others to violate court orders are equally liable and subject to contempt proceedings. *ARA Chuckwagon of Detroit, Inc v Lobert*, 69 Mich App 151, 159; 244 NW2d 393 (1976). When an order is entered by the court, it must be obeyed until it is judicially vacated. *Id.* at 161. The validity of the order is determined by the courts, not the parties. *Id.* "Our jurisprudence has long recognized the inherent power of a court of record to punish, by contempt citation, a party for wilful, continuous, and contemptuous disobedience of its orders." *Id.* at 162-163.

The circuit court has the authority to punish by fine or imprisonment, or both, any neglect, violation of duty, or misconduct by "[p]arties to actions, attorneys, counselors, and all other persons for disobeying any lawful order, decree, or process of the court." MCL

---

[1] With regard to appellants' contention that they were unaware that they could be imprisoned for the contempt of DIBC, I would only add that a party cannot claim lack of notice when the assertion is belied by the pleadings it has filed in the case. See *DeGeorge v Warheit*, 276 Mich App 587, 592-593; 741 NW2d 384 (2007).

600.1701(g). Contempt committed outside the immediate view and presence of the court may be punished by fine or imprisonment, or both, after proof of the facts charged has been made by affidavit or other means and an opportunity to defend has been given. MCL 600.1711(2). MCL 600.1715[2] addresses the punishment of contempt:

> (1) Except as otherwise provided by law, punishment for contempt may be a fine of not more than $7,500.00, or imprisonment which, except in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform shall not exceed 93 days, or both, in the discretion of the court. . . .
>
> (2) If the contempt consists of the omission to perform some act or duty that is still within the power of the person to perform, the imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty, which shall be specified in the order of commitment, and pays the fine, costs, and expenses of the proceedings, which shall be specified in the order of commitment.

"The issuance of an order of contempt rests in the sound discretion of the trial court and is reviewed only for an abuse of discretion." *In re Contempt of Henry*, 282 Mich App 656, 671; 765 NW2d 44 (2009). "We review for an abuse of discretion a trial court's decision to hold a party or individual in contempt." *In re Contempt of*

---

[2] Issues involving statutory interpretation present questions of law reviewed de novo. *Klooster v City of Charlevoix*, 488 Mich 289, 295; 795 NW2d 578 (2011). "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 76; 780 NW2d 753 (2010). To determine the legislative intent, a court must first examine the statute's plain language. *Klooster*, 488 Mich at 296. If the language of the statute is clear and unambiguous, it is presumed that the Legislature intended the meaning plainly expressed in the statute. *Briggs*, 485 Mich at 76.

*Dudzinski*, 257 Mich App 96, 99; 667 NW2d 68 (2003).
The trial court's factual findings are reviewed for clear
error, and questions of law are reviewed de novo. *Porter
v Porter*, 285 Mich App 450, 454-455; 776 NW2d 377
(2009). "Clear error exists when this Court is left with
the definite and firm conviction that a mistake was
made." *Henry*, 282 Mich App at 669. "The abuse of
discretion standard recognizes that there will be cir-
cumstances where there is no single correct outcome
and which require us to defer to the trial court's
judgment; reversal is warranted only when the trial
court's decision is outside the range of principled out-
comes." *Porter*, 285 Mich App at 455.

"The power to hold a party, attorney, or other person
in contempt is the ultimate sanction the trial court has
within its arsenal, allowing it to punish past transgres-
sions, compel future adherence to the rules of engage-
ment, i.e., the court rules and court orders, or compen-
sate the complainant." *In re Contempt of Auto Club Ins
Ass'n*, 243 Mich App 697, 708; 624 NW2d 443 (2000).

> [W]e define[] contempt of court as a willful act, omis-
> sion, or statement that tends to . . . impede the functioning
> of a court. . . . [T]he primary purpose of the contempt
> power is to preserve the effectiveness and sustain the
> power of the courts. Because the power to hold a party in
> contempt is so great, it carries with it the equally great
> responsibility to apply it judiciously and only when the
> contempt is clearly and unequivocally shown. [*Id.* (quota-
> tion marks and citations omitted).]

"Civil contempt proceedings seek compliance through
the imposition of sanctions of indefinite duration, ter-
minable upon the contemnor's compliance or inability
to comply." *DeGeorge v Warheit*, 276 Mich App 587, 592;
741 NW2d 384 (2007). Criminal contempt, however, is
designed to punish past disobedient conduct by impos-
ing an unconditional and definite sentence. *Id.* Al-

though civil contempt is primarily coercive in nature to compel compliance by the contemnor, the civil sanction may also have a punitive effect. *Id.* Confinement or imprisonment may be imposed whether the contempt is civil or criminal in nature. *Borden v Borden,* 67 Mich App 45, 48; 239 NW2d 757 (1976).

> Civil contempt imposes a term of imprisonment which ceases when defendant complies with the court's order or when it is no longer within his power to comply. Civil contempt seeks to coerce compliance, to coerce the defendant to do what he is able to do but refuses to do. The defendant carries the keys to his prison in his own pocket. Criminal contempt, on the other hand, imposes a definite term of imprisonment as punishment for a past offense. [*Id.*]

Contempts are not necessarily wholly civil or altogether criminal because it is not always easy to classify a particular act as belonging to either class. *Gompers v Buck's Stove & Range Co,* 221 US 418, 441; 31 S Ct 492; 55 L Ed 797 (1911). The *Gompers* Court offered the following test to determine the character of the punishment and held that any indirect overlapping consequences did not alter the nature of the contempt:

> It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial, as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprison-

ment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

* * *

It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment which is merely coercive and remedial, into that which is solely punitive in character, or *vice versa.* [*Id.* at 441-443.]

Similarly, Michigan law provides that when conditional and coercive confinement is imposed, the contempt proceeding is civil. *Borden,* 67 Mich App at 49. Michigan statutes also hold that a "commitment to coerce performance may properly continue so long as it is within the power of the contemnor to comply with the court order." *Id.*; see also MCL 600.1715.

Furthermore, Michigan law recognizes two types of civil contempt sanctions, coercive and compensatory. *In re Contempt of Rochlin,* 186 Mich App 639, 646; 465 NW2d 388 (1990). In *United States v United Mine Workers of America,* 330 US 258, 304; 67 S Ct 677; 91 L Ed 884 (1947), the United States Supreme Court explained the underlying rationale behind the two types of civil contempt sanctions:

Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be

based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent on the outcome of the basic controversy.

But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired. [Citations omitted.]

The longstanding rule is that "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *United States v Rylander*, 460 US 752, 756; 103 S Ct 1548; 75 L Ed 2d 521 (1983) (quotation marks and citation omitted). "Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required." *Int'l Union, United Mine Workers of America v Bagwell*, 512 US 821, 831; 114 S Ct 2552; 129 L Ed 2d 642 (1994). Consequently, civil contempt "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.* at 827. Due process does not require a full-blown evidentiary hearing, and contempt sanctions may even be imposed on the basis of uncontroverted affidavits. *United States v Ayres*, 166 F3d 991, 995 (CA 9, 1999); see also MCL 600.1711(2).

The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance. Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative

act, and thus carries the keys of his prison in his own
pocket. [*Bagwell*, 512 US at 828 (quotation marks and
citations omitted).]

When civil contempt occurs, the trial court has inherent
and statutory authority to order conditional imprison-
ment. *Harvey v Lewis*, 10 Mich App 709, 717; 160 NW2d
391 (1968). "Theoretically, imprisonment for civil con-
tempt might be *forever* so long as it is within the
contemnor's power to comply with the court order he
refuses to carry out[.]" *Id.* (emphasis added). The
determination regarding the propriety of contempt is
contingent on the facts and circumstances of the indi-
vidual case. See *Spallone v United States*, 493 US 265,
267, 279-280; 110 S Ct 625; 107 L Ed 2d 644 (1990); *In
re Simmons*, 248 Mich 297, 305-306; 226 NW 907
(1929); *Stowe v Wolverine Metal Specialties Co*, 242
Mich 624, 630; 219 NW 714 (1928); *Wells v Wells*, 144
Mich App 722, 732; 375 NW2d 800 (1985). When
selecting the appropriate contempt sanction, the court
must use the least possible power necessary to achieve
the proposed end. *Spallone*, 493 US at 276. However, if
the least possible contempt sanction approach fails to
produce compliance within a reasonable period of time,
additional sanctions may be imposed. *Id.* at 280.

Because the objective of civil contempt is to enforce
compliance with the court's order rather than punish-
ment for a refusal to obey, one held in and incarcerated
for civil contempt may not be incarcerated beyond the
time that he or she is able to comply with the court's
order. *Spalter v Wayne Circuit Judge*, 35 Mich App 156,
161; 192 NW2d 347 (1971). "The contemnor must have
the ability to comply with the court's order and the
possibility of terminating his or her confinement and
purging himself of contempt by complying." *Borden*, 67
Mich App at 49. "Promised future compliance with

prior judicial orders is a common and appropriate method of purging contempt. Since future compliance is the court's objective in civil contempt proceedings, an assurance of such compliance by one deemed worthy of belief is a sensible basis for terminating coercive sanctions." *Williams Int'l Corp v Smith*, 144 Mich App 257, 266; 375 NW2d 408 (1985) (citations omitted), rev'd on other grounds 429 Mich 81 (1987). The court is vested with broad discretion to determine the appropriate conditions through which the contemnor may purge the contempt. *Midlarsky v D'Urso*, 133 AD2d 616; 519 NYS2d 724 (1987). The appellate court reviews the denial of a motion to purge a contempt order for an abuse of discretion. *Consol Rail Corp v Yashinsky*, 170 F3d 591, 594 (CA 6, 1999).

Appellants contend that because the completion of the project will take approximately 9 to 12 months, they do not have the ability to "immediately" purge the contempt and, therefore, do not have the keys to their jail cell. Appellants further contend that the trial court was obligated to impose the least restrictive sanction to compel compliance. Curiously, appellants fail to identify the least restrictive sanction or impetus that would prompt them into action on behalf of DIBC.[3]

As indicated, the propriety of the contempt sanction is contingent on the facts and circumstances in each individual case, and although the least restrictive sanction should be imposed, a graduated penalty is appro-

---

[3] Our order granting a stay of the lower court's decision only applied to appellants' imprisonment, and there was no stay of the payment of fines or the ordered completion of the Ambassador Bridge Gateway Project in accordance with the February 1, 2010, order of the trial court. When questioned at oral argument about the progress with regard to the remainder of the trial court's order, counsel for appellants answered that there was the mere filing of the claim of appeal. During rebuttal, cocounsel asserted that they had submitted plans, but they were refused.

priate when necessary. See *Spallone*, 493 US at 276, 280; *Wells*, 144 Mich App at 732. The trial court is granted the broad discretion to determine the appropriate conditions through which the contemnor may purge the contempt. *Midlarsky*, 133 AD2d at 617. Pursuant to Michigan caselaw, full compliance with the contempt order is not necessarily required; rather, a promise of future compliance or a good-faith attempt may be sufficient to purge the contempt. *Williams Int'l Corp*, 144 Mich App at 266.

In the present case, the facts and circumstances justified the order of confinement pending completion of the Ambassador Bridge Gateway Project. The extensive and lengthy record demonstrates that the trial court ordered completion of the project. Rather than comply with the trial court's order, DIBC filed multiple claims of appeal, and the case was removed to federal court on two occasions. DIBC did not obtain any relief from the trial court's order,[4] but nonetheless failed to comply with that order. Unable to obtain compliance, the trial court held a contempt hearing during which Stamper testified. The trial court determined that civil coercive sanctions were necessary to ensure compliance, and Stamper, as president of DIBC, was ordered imprisoned but was released within a short time when DIBC restarted work on the project. However, since then, DIBC has not complied with the trial court's order. This order has not been declared invalid, and, consequently, the trial court has inherent contempt power to punish the willful, continuous, and contemptuous disobedience of the order. *ARA Chuckwagon*, 69

---

[4] The federal court concluded that DIBC had engaged in "the most creative schemes and maneuvers to delay compliance with a court order." *Mason and Dixon Lines, Inc v Steudle*, 761 F Supp 2d 611, 628 (ED Mich, 2011) (quotation marks and citation omitted).

Mich App at 162-163. Although the court has the obligation to consider the least restrictive penalty, in the present case, the court graduated its punishment in light of the history of delay and noncompliance. Under the circumstances, I cannot conclude that ordering the contempt sanction until completion of the project constituted an abuse of discretion.

Furthermore, the contention that appellants are without the means or the knowledge to immediately purge the contempt is without merit. The design of coercive civil contempt sanctions is to achieve compliance, to force the contemnor to do what he or she refuses to do. *Borden*, 67 Mich App at 48. "Civil contempt proceedings seek compliance through the imposition of sanctions of *indefinite* duration, terminable upon the contemnor's compliance or inability to comply." *DeGeorge*, 276 Mich App at 592 (emphasis added). "The power to hold a party, attorney, or other person in contempt is the ultimate sanction the trial court has within its arsenal, allowing it to punish past transgressions, compel future adherence to the rules of engagement, i.e., the court rules and court orders, or compensate the complainant." *Auto Club*, 243 Mich App at 708. DIBC's conduct rose to the height of contempt. According to the factual findings of the trial court, it not only failed to comply with the trial court's order, but engaged in a process designed to render the project stagnant. This comes at a great cost to MDOT as well as the local community where the construction commenced, and the trial court must be entitled to use the ultimate sanction within its arsenal. *Id.* However, appellants have the right to move the trial court to purge the contempt, *Spalter*, 35 Mich App at 166, and can be released before the full completion by promises of future compliance or good faith efforts, *Williams Int'l Corp*, 144 Mich App at 266. In light of the fact that

appellants can purge the contempt before the full completion of the project, I cannot conclude that the trial court's decision regarding the imprisonment constituted an abuse of discretion.

I would affirm the lower court's order in its entirety.