*In re* CONTEMPT OF DORSEY

Docket No. 309269. Submitted February 8, 2013, at Lansing. Decided September 9, 2014, at 9:10 a.m. Leave to appeal sought.

A delinquency petition was filed in the Livingston Circuit Court, Family Division, charging Tyler Dorsey, a minor, with carrying a dangerous weapon with unlawful intent, receiving and concealing stolen property, possession of a controlled substance, and possession of alcohol by a minor. The weapon and alcohol charges were dismissed and Tyler pleaded guilty to the remaining charges. Tyler was placed on probation and ordered to complete a number of terms and conditions, including submitting to random drug screens. Tyler thereafter tested positive for a controlled substance. In addition, petitions were filed against Tyler charging him with domestic violence, first-degree home invasion, and possession of alcohol by a minor. Tyler was placed in a residential facility. During a placement review hearing, Tyler's probation officer informed the court that an abuse and neglect petition had been filed by Tyler's guardian ad litem, naming Kelly M. Dorsey, Tyler's mother, and another as respondents. The probation officer recommended continuation of Tyler's placement in the facility and that the court order Kelly and her daughter, Destiny Dorsey, to submit to random drug tests. The court, David J. Reader, J., entered an order dated January 14, 2011, requiring Kelly and Destiny to submit to random drug tests. The court also ordered that Kelly's home remain drug and alcohol free and subject to random searches. Tyler pleaded guilty to a misdemeanor charge of larceny in a vacant building and the charges of home invasion and possession of alcohol by a minor were dismissed. Tyler was released from the residential facility and into Kelly's custody following another placement review hearing. Tyler thereafter tested positive for K2, a synthetic form of cannabis. His probation officer sought to have the court hold him in criminal contempt and requested that Kelly begin biweekly drug screenings. After Kelly failed to take drug screenings requested by the probation officer, the probation officer filed motions for show-cause hearings and the court granted the motions and ordered Kelly to appear and show cause why she should not be found in criminal contempt for failing to submit to the requested drug tests. Kelly appeared and stated that, although she had been aware of an order in the abuse and neglect case that required her to submit to random

drug tests, she was not aware that the court had entered an order in the delinquency proceedings requiring her to submit to such tests. The court, David J. Reader, J., found Kelly in contempt of court for failing to comply with the court's order to submit to blood testing and entered a written order of contempt. A second order of contempt was entered four days later. The court thereafter denied Kelly's motion for a judgment of acquittal or a new trial as well as her motion to correct the sentence. Kelly appealed.

The Court of Appeals *held*:

1. The family court in the delinquency proceeding was entitled, under MCL 712A.6, to render orders affecting adults that were necessary for the physical, mental, or moral well-being of Tyler. Kelly's contention that the court lacked subject-matter jurisdiction is without merit.

2. An order entered by a court must be obeyed until it is judicially vacated. Generally, all persons who interfere with the proper exercise of a court's judicial function are punishable for contempt. Kelly could be punished for contempt because the court concluded that she interfered with the court's function.

3. The court's order in the delinquency proceeding requiring Kelly to submit to random drug testing was unconstitutional under US Const, Am IV and Const 1963, art 1, § 11. However, the unconstitutionality of the order was not a defense to the criminal contempt allegations. The order was entered by a court with proper jurisdiction and Kelly was required to follow it.

4. Kelly waived any objection to the order in the delinquency proceeding that required her to submit to random drug testing.

5. The court properly made its findings of contempt under the "beyond a reasonable doubt" standard not the "preponderance of the evidence" standard.

6. There is no merit to Kelly's argument that there was insufficient evidence that she willfully disregarded or disobeyed the court's order to submit to drug testing because she was confused about the order and intended to consult an attorney before submitting to testing. There was competent evidence to support the finding that the elements of criminal contempt were proven beyond a reasonable doubt.

Affirmed.

1. CIRCUIT COURTS — FAMILY DIVISION — JURISDICTION — ORDERS AFFECTING ADULTS.

   The family division of the circuit court has jurisdiction to make orders affecting adults when, in the opinion of the court, such

orders are necessary for the physical, mental, or moral well-being of a particular juvenile or juveniles under its jurisdiction; such orders are incidental to the jurisdiction of the court over the juvenile or juveniles (MCL 712A.6).

2. MOTION AND ORDERS — APPEAL.

An order entered by a court with proper jurisdiction must be obeyed, even if the order is clearly incorrect, until it is judicially vacated.

3. CONTEMPT — PARTIES — NONPARTIES.

Generally, all persons who interfere with the proper exercise of a court's judicial function, whether parties or strangers, are punishable for contempt.

*William J. Vailliencourt, Jr.*, Prosecuting Attorney, and *William M. Worden*, Assistant Prosecuting Attorney, for the Livingston County Prosecuting Attorney.

*The Law Office of Kurt T. Koehler* (by *Kurt T. Koehler*) for Kelly M. Dorsey.

Before: K. F. KELLY, P.J., and MARKEY and FORT HOOD, JJ.

PER CURIAM. Appellant, Kelly Michelle Dorsey, appeals by right the contempt order entered by the Livingston Circuit Court, Family Division (the family court). As part of her son's juvenile adjudication, the family court entered an order requiring appellant to submit to random drug screens at the request of the probation department. The court found appellant in criminal contempt after she refused to comply with the order, and she was sentenced to 93 days in jail and ordered to pay $200 in costs, $120 in attorney's fees, and $500 in fines. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

The criminal contempt proceeding against appellant originated from juvenile delinquency proceedings con-

cerning appellant's son, Tyler Dorsey. Tyler first came to the attention of the family court in April 2008, when he was charged with three counts of breaking and entering a vehicle, MCL 750.356a(2)(a). Tyler was placed on the consent calendar/informal docket, which he successfully completed on July 3, 2009.

A second delinquency petition was filed in December 2009, when Tyler was charged with carrying a dangerous weapon with unlawful intent, MCL 750.226, receiving and concealing stolen property, MCL 750.535, possession of a controlled substance (hydrocodone), MCL 333.7403(2)(b)(*ii*), and possession of alcohol by a minor, MCL 436.1703(1)(a). The weapon and alcohol charges were dismissed, and Tyler pleaded guilty to the remaining charges. A dispositional hearing/sentencing was scheduled for March 25, 2010, but, it was adjourned after Tyler's father died.

After the father's death, Kimberly Ognian, the father's longtime girlfriend, was named Tyler's guardian. A dispositional hearing was scheduled for April 16, 2010. Before the hearing, Tyler's probation officer, Susan Grohman, submitted a report and recommendation to the family court. Grohman reported that Ognian was Tyler's primary caregiver and that appellant had not been involved in Tyler's life for the past year. Grohman further reported that appellant had "alcohol/drug problems and a criminal record." Tyler was referred for a biopsychosocial assessment. In his assessment, Tyler reported "little contact with his mother [appellant] recently and that he feels that this might be due to his mother's substance abuse."

On April 16, 2010, Tyler was placed on probation and ordered to complete a number of terms and conditions, including random drug screens. On August 2, 2010, Tyler tested positive for benzodiazepines. Shortly

thereafter, a petition charging Tyler with domestic violence was filed, MCL 750.81(2). The victim was Meagan Ognian, Kimberly Ognian's daughter, with whom Tyler was living and in a relationship. Tyler was removed from Kimberly Ognian's care and went to live with appellant.

On August 20, 2010, another petition was filed, charging Tyler with first-degree home invasion, MCL 750.110a(2), and possession of alcohol by a minor, MCL 436.1703(1)(a). Grohman reported that Tyler's biggest problem was a lack of supervision. Tyler was allowed to come and go as he pleased and was seen walking around downtown Howell at all hours of the night. Because of his chronic delinquency and the inability of appellant and his guardian to control him, Tyler was placed in a residential facility.

Appellant and her daughter, Destiny Dorsey, visited Tyler at the facility and participated in family counseling sessions. According to the counselor's report, appellant and Destiny both denied that they used drugs and further reported that they did not keep alcohol in the house. Appellant did report, however, that "she had a serious drug problem several years ago when she got divorced . . . . [Appellant] acknowledged that the only way she knew how to cope with her feelings was to escape by smoking crack cocaine." Appellant represented to the family counselor that she had changed and could be a positive parent for Tyler.

Tyler's behavior began to improve at the facility, and a placement review hearing was conducted on January 13, 2011. Grohman reported that Tyler was doing well and had been granted a day pass for Christmas to see his grandparents. Grohman further stated:

> Transportation became an issue due to the fact that the grandparents had to cook and entertain. Tyler's sister and

[appellant] became the next logical choice for a transport. A drug test was requested prior to allowing Tyler to be released to the care and custody of [appellant]. Due to the fact that his sister would be driving, she agreed to submit to a test as well. From the date the test [was] requested [to] the date [appellant] and Destiny appeared for a test, three days had lapsed. The test would not return prior to Christmas so a decision was made to allow the visit to take place in an effort not to punish Tyler. Unfortunately, both tests returned diluted. A retest was requested. To date, Destiny has failed to appear and [appellant] did report (again not on the day requested). [Appellant's] test returned negative for all substances.

\* \* \*

In the meantime Tyler's [guardian ad litem] filed an abuse and neglect petition naming both [appellant] and Kim Ognian as respondents. Since the time of this hearing, Kim's guardianship has been terminated.

Grohman recommended that Tyler's facility placement continue and that the family court order appellant and Destiny to submit to random drug tests. Following the hearing, the family court issued an order dated January 14, 2011, requiring appellant and Destiny to "submit to random drug testing as requested by Maurice Spear Campus or the probation department." The family court further ordered that appellant's home remain drug and alcohol free and subject to random searches.

On August 26, 2011, the family court conducted another placement review hearing.[1] Grohman reported that Tyler and appellant responded extremely well to services at the residential facility. Further, Grohman stated that the Department of Human Services (DHS)

---

[1] Tyler previously pleaded guilty to a misdemeanor charge of larceny in a vacant building, MCL 750.359, and the prosecutor dismissed the home invasion and minor in possession of alcohol charges.

reported full compliance by appellant in her abuse and neglect case. Following the hearing, the family court entered an order releasing Tyler into appellant's custody.

On December 19 and December 27, 2011, Tyler tested positive for K2, a synthetic form of cannabis.[2] On January 9, 2012, Grohman filed a motion requesting that the family court issue an order directing Tyler to appear and show cause why he should not be found in criminal contempt. Also on January 9, 2012, Grohman requested that appellant begin biweekly drug screenings at Second Chance.

Appellant reported to Second Chance on January 9 and 10, 2012, but she refused to test both days. After appellant's second refusal, Grohman filed two show-cause motions. Both motions referred to the January 14, 2011 order requiring appellant to submit to random drug tests. The family court granted both motions and ordered appellant to appear and show cause why she should not be found in criminal contempt.

Counsel was appointed for appellant, and a show-cause hearing was conducted on February 2, 2012. During the hearing, Grohman referred to the juvenile proceedings and the abuse and neglect proceeding, noting that appellant's abuse and neglect case had been closed by the DHS. Grohman stated that appellant was required to drug test in the abuse and neglect case and was compliant with testing in that case.[3] Grohman stated that she asked appellant to test in the delin-

---

[2] Tyler had not been tested for K2 before.

[3] Grohman's report shows the DHS began testing appellant in the abuse and neglect case on March 7, 2011. Two testing dates are listed for appellant's abuse and neglect case, March 7, 2011, and September 29, 2011. Appellant tested positive for alcohol on March 7, 2011, and negative for all substances on September 29, 2011.

quency case on January 9, 10, 11, 12, 13, and 17, 2012, and appellant had refused each time. Grohman did not show appellant the January 14, 2011 order requiring appellant to submit to random drug testing, but Grohman spoke with appellant, and appellant was aware of the order. Megan Alcala, a Community Reintegration Program facilitator, corroborated Grohman's testimony. Alcala stated that she was present when Grohman spoke with appellant and requested appellant to take a drug test. Alcala stated that Grohman explained to appellant that there was a court order and that appellant appeared to understand.

Appellant testified that she was confused between the delinquency case and the abuse and neglect case. Appellant stated that she was aware of an order requiring her to test in the abuse and neglect case, but she was unaware that there was a similar order in the delinquency case. Appellant stated that the abuse and neglect case was closed in November 2011. Therefore, appellant was confused when Grohman asked her to test on January 9, 2012. Appellant stated that Grohman did not explain that there was an order requiring her to test in the delinquency case. Appellant acknowledged, however, that Grohman had told appellant that "she wanted [appellant] to test for the [delinquency] case." Appellant further stated that she received a piece of paper that stated "it is requested by Sue Grohman, juvenile probation, and Second Chance that you drug test though Second Chance twice a week until April 16th for drugs, alcohol, and K2." Appellant stated: "I didn't refuse right then but I refused later on that day until I could talk to my attorney." Appellant further stated: "I didn't know if it was legal . . . because my [abuse and neglect] case was closed and I hadn't—there wasn't—in my opinion there was no reason why I would have to do a drug test."

At the conclusion of the hearing, the family court found appellant in contempt of court for failing to comply with the court's order. On February 6, 2012, the family court entered a written order of contempt. The order appears to be a standard court document and includes boxes labeled "preponderance of the evidence" and "beyond a reasonable doubt." The "preponderance of the evidence" box was checked on the order. The order did not indicate whether appellant was found guilty of civil or criminal contempt.

The family court adjourned sentencing to allow appellant to report to Second Chance for a drug test. On February 9, 2012, the family court sentenced appellant to 93 days in jail. The court further ordered appellant to pay costs in the amount of $200, attorney's fees in the amount of $120, and "a total of $500 to the court within 30 days of her release from jail." The family court indicated that appellant did take a drug test on February 2, 2012, but the court did not disclose the results. A second order of contempt was entered February 10, 2012. The "preponderance of the evidence" box was checked and the order did not indicate whether appellant was found guilty of criminal or civil contempt.

Following sentencing, appellant filed three motions: a motion for a judgment of acquittal or a new trial, a motion to correct the sentence, and a motion to stay execution of the sentence. In the motions, appellant argued that the family court's order requiring appellant to submit to drug testing was beyond its jurisdiction and authority. Additionally, appellant argued that the order violated her right to be free from unreasonable searches and seizures. Finally, appellant argued that there was insufficient evidence to convict her of criminal contempt. Specifically, appellant noted that the family court checked the "preponderance of evidence"

box on the order of contempt. Appellant argued that a preponderance of evidence was insufficient to sustain her conviction for criminal contempt.

A hearing on all three motions was conducted. After hearing arguments, the family court denied appellant's motion for a judgment of acquittal or a new trial, as well as her motion to correct the sentence. The family court clarified that appellant was found guilty of criminal contempt and that its findings were beyond a reasonable doubt. The court indicated that there was a clerical error on the contempt order. Additionally, the court rejected appellant's argument that its order requiring appellant to drug test was beyond its jurisdiction or authority, stating that "the jurisdiction of the parent is in essence obtained, in the opinion of the Court, by way of jurisdiction over the juvenile." The court granted appellant's motion to stay the sentence pending appeal to this Court.

## II. JURISDICTION

As an initial matter we note that appellant contends that the family court did not have subject-matter jurisdiction. We disagree.

The interpretation and application of a statute presents a question of law that the appellate court reviews de novo. *Whitman v City of Burton*, 493 Mich 303, 311; 831 NW2d 223 (2013). The judiciary's objective when interpreting a statute is to discern and give effect to the intent of the Legislature. *Id.* This Court's review of jurisdictional issues is de novo. *Pontiac Food Ctr v Dep't of Community Health*, 282 Mich App 331, 335; 766 NW2d 42 (2009). Issues involving the interpretation of court rules are also reviewed de novo as questions of law. *Id.* "The term jurisdiction refers to the power of a court to act and the authority a court has to hear and

determine a case." *Wayne Co Chief Executive v Governor*, 230 Mich App 258, 269; 583 NW2d 512 (1998). "The 'power to review' thus granted is the power to hear and determine. It is language of jurisdiction." *Peplinski v Employment Security Comm*, 359 Mich 665, 668; 103 NW2d 454 (1960). Questions surrounding subject-matter jurisdiction present questions of law and are reviewed de novo. *In re Lager Estate*, 286 Mich App 158, 162; 779 NW2d 310 (2009). Generally, subject-matter jurisdiction is defined as a court's power to hear and determine a cause or matter. *Id.* More specifically, subject-matter jurisdiction is the deciding body's authority to try a case of the kind or character pending before it, regardless of the particular facts of the case. *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 204; 631 NW2d 733 (2001). Subject-matter jurisdiction cannot be waived and can be raised at any time by any party or the court. *MJC/Lotus Group v Brownstown Twp*, 293 Mich App 1, 7-8; 809 NW2d 605 (2011), rev'd in part on other grounds *Mich Props, LLC v Meridian Twp*, 491 Mich 518 (2012). The plaintiff bears the burden of demonstrating subject-matter jurisdiction. *Phinney v Perlmutter*, 222 Mich App 513, 521; 564 NW2d 532 (1997). A trial court must dismiss an action when there is a lack of subject-matter jurisdiction, and a party cannot be estopped from raising the issue. *In re Acquisition of Land for the Central Indus Park Project*, 177 Mich App 11, 17; 441 NW2d 27 (1989).

"Before a court may obligate a party to comply with its orders, the court must have in personam jurisdiction over the party." *Oberlies v Searchmont Resort, Inc*, 246 Mich App 424, 427; 633 NW2d 408 (2001). General personal jurisdiction over individuals may be established by domicile in this state or consent, MCL 600.701, and limited personal jurisdiction may be established by maintaining domicile in this state while sub-

ject to a family relationship that is the basis of a claim for divorce, alimony, separate maintenance, property settlement, child support, or child custody, MCL 600.705(7). The defense of lack of personal jurisdiction may be waived. *Dundee v Puerto Rico Marine Mgt, Inc*, 147 Mich App 254, 257; 383 NW2d 176 (1985).

"Const 1963, art 6, § 15 grants probate courts 'original jurisdiction in all cases of juvenile delinquents and dependents, except as otherwise provided by law.' " *In re AMB*, 248 Mich App 144, 167; 640 NW2d 262 (2001). The family division of the circuit court (family court) now exercises this jurisdiction. *People v Thenghkam*, 240 Mich App 29, 36; 610 NW2d 571 (2000), reasoning and analysis repudiated in part on other grounds in *People v Petty*, 469 Mich 108 (2003).[4] "In construing jurisdictional statutes, retention of jurisdiction is presumed, and any intent to divest a court of jurisdiction must be clearly and unambiguously stated." *In re Waite*, 188 Mich App 189, 202; 468 NW2d 912 (1991).

Under MCL 712A.2, the family division of the circuit court obtained authority over juveniles. The family court also acquires jurisdiction over adults pursuant to MCL 712A.6, which provides as follows:

> The court has jurisdiction over adults as provided in this chapter and as provided in chapter 10A of the revised judicature act of 1961, 1961 PA 236, MCL 600.1060 to 600.1082, and may make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or moral well-being of a particular juvenile or juveniles under its jurisdiction. However, those orders shall be incidental to the jurisdiction of the court over the juvenile or juveniles.

---

[4] See also MCL 600.1009, which provides: "A reference to the former juvenile division of probate court in any statute of this state shall be construed to be a reference to the family division of circuit court."

Appellant's contention that the family court lacked subject-matter jurisdiction is without merit. The subject matter of the proceeding involved the appellant's son's juvenile proceeding. Accordingly, the family court was entitled to render orders affecting adults that were necessary for the physical, mental, or moral well-being of appellant's son. We reject appellant's challenge to the subject-matter jurisdiction of the court.

Furthermore, individuals who violate court orders are subject to contempt proceedings. See *ARA Chuckwagon of Detroit, Inc v Lobert*, 69 Mich App 151, 159; 244 NW2d 393 (1976). An order entered by a court must be obeyed until it is judicially vacated. *Id*. at 161. The validity of an order is determined by the courts, not the parties. *Id*. "Generally, all persons who interfere with the proper exercise of a court's judicial function, whether parties or strangers, are punishable for contempt." 8 Michigan Law & Practice (2d ed), Contempt, § 2, p 3. Because the family court concluded that appellant interfered with the court's function, appellant could be punished for contempt. *Id*.

### III. SEARCH AND SEIZURE AND RANDOM DRUG SCREENS

Appellant next contends that the family court order for random drug screens constituted an illegal search and seizure. The family court's order requiring appellant to submit to random drug testing was unconstitutional under the Fourth Amendment and Const 1963, art 1, § 11. However, the unconstitutionality of the order is not a defense to criminal contempt allegations. The order was entered by a court with proper jurisdiction. Therefore, appellant was required to follow it.

The application of constitutional standards to uncontested facts is a question of law subject to review de novo. *People v Stevens (After Remand)*, 460 Mich 626,

631; 597 NW2d 53 (1999). "This Court review[s] de novo whether the Fourth Amendment was violated . . . ." *People v Mungo (On Second Remand)*, 295 Mich App 537, 545; 813 NW2d 796 (2012) (quotation marks and citation omitted).

"It is well settled that both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Hyde*, 285 Mich App 428, 438; 775 NW2d 833 (2009) (quotation marks and citations omitted); see also US Const, Am IV; Const 1963, art 1, § 11. The Michigan Constitution in this regard is generally construed to provide the same protection as the Fourth Amendment of the United States Constitution. *People v Slaughter*, 489 Mich 302, 311; 803 NW2d 171 (2011). The touchstone of the Fourth Amendment is reasonableness. *Brigham City, Utah v Stuart*, 547 US 398, 403; 126 S Ct 1943; 164 L Ed 2d 650 (2006). Whether a particular search and seizure is reasonable "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner v Railway Labor Executives' Ass'n*, 489 US 602, 619; 109 S Ct 1402; 103 L Ed 2d 639 (1989) (quotation marks and citation omitted). In most criminal cases, this balance is struck "in favor of the procedures described by the Warrant Clause of the Fourth Amendment. Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." *Id.* (citation omitted); see also *People v Borchard-Ruhland*, 460 Mich 278, 293-294; 597 NW2d 1 (1999).

An order requiring a student to submit to drug testing is an intrusion on bodily privacy and is, there-

fore, a search under the Fourth Amendment. *Vernonia Sch Dist 47J v Acton*, 515 US 646, 652; 115 S Ct 2386; 132 L Ed 2d 564 (1995) ("[S]tate-compelled collection and testing of urine . . . constitutes a 'search' subject to the demands of the Fourth Amendment."). See also *Skinner*, 489 US at 617. Such a search, however, "will survive constitutional scrutiny, in the absence of a warrant or individualized suspicion, if the 'important governmental interest furthered by the intrusion' outweighs the 'privacy interests implicated by the search . . . .' " *Middlebrooks v Wayne Co*, 446 Mich 151, 159; 521 NW2d 774 (1994), quoting *Skinner*, 489 US at 624. Although the state has an important governmental interest in protecting and rehabilitating juvenile offenders, such interest does not outweigh appellant's right to privacy in this case.

Michigan has not previously addressed the specific issue presented in this case. Other jurisdictions, however, have. In *State v Doe*, 149 Idaho 353; 233 P3d 1275 (2010), the Does' minor daughter was placed on formal probation under Idaho's Juvenile Corrections Act (JCA). *Id.* at 355. A social investigation revealed that the Does had a history of drug abuse. Accordingly, the magistrate judge ordered the Does "to undergo random drug urinalyses as a term of their daughter's probation." *Id.* The Supreme Court of Idaho concluded that the probation order violated the Fourth Amendment. *Id.* at 357-360. The court began its analysis concluding that the Does retained an undiminished expectation to privacy: "Although the Does' daughter is on probation, it does not necessarily follow that they themselves are subject to a diminished expectation of privacy in their bodily fluids." *Id.* at 358. The court acknowledged the state's legitimate interest in protecting and rehabilitating children but held that "even where a substan-

tial State interest exists, this Court will not uphold a search 'whose primary purpose is ultimately indistinguishable from the general interest in crime control.' " *Id*. at 359 quoting *City of Indianapolis v Edmond*, 531 US 32, 44; 121 S Ct 447; 148 L Ed 2d 333 (2000).

The *Doe* court took guidance from *Ferguson v City of Charleston*, 532 US 67; 121 S Ct 1281; 149 L Ed 2d 205 (2001). In *Ferguson*, the Supreme Court analyzed the constitutionality of a state hospital's policy of performing nonconsensual drug testing on pregnant women suspected of cocaine abuse. *Id*. at 69-70. The policy provided for a referral to substance-abuse treatment for women who tested positive and added the threat of law enforcement intervention. *Id*. at 72. The Supreme Court found the policy violative of the Fourth Amendment because "the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment." *Id*. at 80. The Supreme Court observed that the "ultimate goal" of the program, i.e., substance-abuse treatment, may have been salutary, but "the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal." *Id*. at 82-83. Although the hospital intended that the threat of prosecution would curtail drug use, the "direct and primary purpose" of the scheme was to assist the police. *Id*. at 84. The Supreme Court found the distinction critical, explaining:

> Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose. [*Id*.]

Relying on *Ferguson*, the *Doe* court concluded that the urinalysis requirement violated the Fourth Amendment:

> Just like the testing program in *Ferguson*, testing in this case is characterized by a general interest in law enforcement. The magistrate imposed the urinalysis requirement during juvenile delinquency proceedings under the JCA, which are quasi-criminal in nature. The magistrate's order requires the Does to report to their daughter's probation officer, who is an officer of the county required by law to "enforce probation conditions." Nothing prevented the probation officer from conveying the Does' test results to law enforcement. Their failure to comply could result in contempt sanctions, which would be brought and pursued by the prosecuting attorney. Indeed, the juvenile probation officer in this case reported the parents' positive urinalysis results to the prosecutor. It also appears that such evidence could be used to obtain search warrants against the Does and would be admissible against the Does in further criminal proceedings for encouraging their daughter's delinquency.
>
> . . . Just as the urine-test requirement in *Ferguson* was intended to protect the health of unborn fetuses by detecting prenatal cocaine use, the drug testing here is intended to ensure the Does' daughter's rehabilitation by detecting drug use at home. The immediate method for attaining the goals in both cases is to report the drug use for criminal sanctions. [*Doe*, 149 Idaho at 359-360 (citations omitted).]

A similar conclusion was reached by the Utah Supreme Court in *State v Moreno*, 2009 Utah 15; 203 P3d 1000 (2009). In *Moreno*, the defendant's juvenile daughter was adjudicated "delinquent for possession of marijuana and attempted possession of methamphetamine." *Id.* at ¶ 1. As part of his daughter's probation, the juvenile court ordered the defendant to undergo drug testing. *Id.* The Utah Supreme Court concluded that the order violated the Fourth Amendment. *Id.* at ¶ 42.

Like the *Doe* court, the *Moreno* court concluded that the defendant enjoyed an undiminished expectation of privacy: "A parent does not surrender his expectation of privacy merely because he acquires the status of a parent of a minor who has been adjudicated delinquent." *Id.* at ¶ 29. The *Moreno* court also recognized the government's interest of ensuring "that the parent is drug free and therefore is not providing an inappropriate example to the minor or directly contributing to the minor's drug use." *Id.* at ¶ 32. However, the court held that this interest was of secondary importance:

> The focus of the juvenile court system . . . is on modifying the behavior of the juvenile. Because the focus is on the behavior of the juvenile, the behavior of parents of juveniles involved in the system is of secondary importance.
>
> Attempting to ensure that parents of delinquent juveniles are drug free also should not be confused with the goal of protecting children where there is a concern for their welfare. In the presence of a welfare concern related to the parent's drug use, the government's interest is decidedly increased, as are the possible consequences of waiting until there is probable cause for a search. By contrast, where the concern of the proceeding is the child's delinquent behavior, there is less necessity to obtain information about the parent's behavior. There is time to obtain information that will provide probable cause for a search of the parent. [*Id.* at ¶¶ 33-34.]

Though *Doe*, 149 Idaho 353, and *Moreno*, 2009 Utah 15, are not binding on this Court, their reasoning is persuasive. There is no dispute that the state has an interest in protecting and rehabilitating children who have been adjudicated delinquent. However, appellant did not enjoy a diminished expectation to privacy merely by virtue of the fact that her son had been adjudicated delinquent. *Doe*, 149 Idaho at 358; *Moreno*, 2009 Utah at ¶ 29. Appellant enjoyed the full measure of

Fourth Amendment protections. The ultimate goal of drug testing appellant may have been salutary, but the primary purpose was "ultimately indistinguishable from the general interest in crime control." *Edmond*, 531 US at 44. The order was imposed as part of a juvenile adjudication, which is quasi-criminal in nature. *People v Williams*, 147 Mich App 1, 6; 382 NW2d 191 (1985). Appellant was ordered to test at the direction of her son's probation officer, and nothing prevented the probation officer from turning over appellant's test results to law enforcement personnel. Additionally, appellant's failure to comply with the order could, and did, result in criminal contempt sanctions, which were pursued by the prosecutor. Therefore, the family court's order was unconstitutional under the Fourth Amendment and Const 1963, art 1, § 11.

The constitutionality of the order, however, is not the issue directly before this Court. Rather, the issue is whether appellant was required to follow the order. It is well settled that "[a] party must obey an order entered by a court with proper jurisdiction, even if the order is clearly incorrect, or the party must face the risk of being held in contempt and possibly being ordered to comply with the order at a later date." *Kirby v Mich High Sch Athletic Ass'n*, 459 Mich 23, 40; 585 NW2d 290 (1998); see also *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009). The family court had jurisdiction over appellant under MCL 712A.6.

Appellant argues that MCL 712A.6 must be interpreted in a constitutional manner, and "MCL 712A.6 cannot be interpreted to grant the [family court] subject matter jurisdiction to issue unconstitutional orders." However, the longstanding policy is that "a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed

and thus become a retrial of the original controversy." *United States v Rylander*, 460 US 752, 756; 103 S Ct 1548; 75 L Ed 2d 521 (1983) (quotation marks and citation omitted). Rather, the underlying challenge to the original order cannot be raised for the first time in a contempt proceeding. *Id.* Further, appellant waived the challenge to the order underlying the contempt. Forfeiture is the failure to timely assert a right. *People v Carines*, 460 Mich 750, 762 n 7; 597 NW2d 130 (1999). Waiver is the "intentional relinquishment or abandonment of a known right." *Id.* (quotations marks and citation omitted). The failure to object deprives the "court of the opportunity to correct the error at the time it occurs." *People v Vaughn*, 491 Mich 642, 674; 821 NW2d 288 (2012). "[U]nequivocal indications" that one approved of a course of action taken in the trial court constitute waiver. *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). "To hold otherwise would allow counsel to harbor error at trial and then use that error as an appellate parachute[.]" *Id.* (quotation marks and citation omitted). A person can waive his or her constitutional rights, including the right to a public trial, *Vaughn*, 491 Mich at 664, as well as statutory rights, *In re Receivership of 11910 South Francis Rd*, 492 Mich 208, 228; 821 NW2d 503 (2012).

Here, the family court issued an order dated January 14, 2011, requiring appellant to "submit to random drug testing as requested by Maurice Spear Campus or the probation department." The family court further ordered that appellant's home remain drug and alcohol free and subject to random searches. Appellant did not contest the authority of the family court to enter this order in the juvenile proceeding as opposed to the then concurrently pending abuse and neglect petition. Indeed, compliance with the drugs screens was a requirement to reunite appellant with her son. Further, the

DHS reported that appellant was in compliance. Nearly a year after the entry of the order, appellant objected to the case from which the order originated only after a show-cause order was entered. However, the order was in place for a year before appellant contested its origin. Therefore, appellant waived this challenge.

### IV. SUFFICIENCY OF THE EVIDENCE OF CONTEMPT

Appellant raises two issues under this question. First, appellant argues that there was insufficient evidence to convict her of criminal contempt because the family court made its findings by a preponderance of the evidence. The family court entered two contempt orders in this case. Both included boxes labeled "preponderance of the evidence" and "beyond a reasonable doubt." The "preponderance of the evidence" box was checked on both orders. Appellant argues that she was found guilty under the preponderance of the evidence standard; therefore, there was insufficient evidence to convict. The family court, however, clarified that there was a clerical mistake and that its findings were under the beyond a reasonable doubt standard. Appellant takes issue with the trial court's action, stating that the burden of proof is a matter of substance. This argument is unpersuasive. The clerical mistake the trial court was referring to was the checking of the "preponderance of evidence box," not the applicable burden of proof.

Appellant next argues that the prosecutor presented insufficient evidence to convict her of criminal contempt. "To support a conviction for criminal contempt, two elements must be proven beyond a reasonable doubt. Those two elements are: (1) that the individual engage in a wilful disregard or disobedience of the order of the court, and (2) that the contempt must be clearly and unequivocally shown." *In re Contempt of O'Neil,*

154 Mich App 245, 247; 397 NW2d 191 (1986) (citations omitted); see also *DeGeorge v Warheit*, 276 Mich App 587, 592; 741 NW2d 384 (2007). The defendant must have acted culpably. *People v Little*, 115 Mich App 662, 665; 321 NW2d 763 (1982).

Appellant argues that there was insufficient evidence that she willfully disregarded or disobeyed the family court's order. Specifically, appellant argues that she did not act willfully because she was confused about the order and intended to consult with counsel before testing. Appellant cites this Court's opinion in *In re Contempt of Rapanos*, 143 Mich App 483, 495; 372 NW2d 598 (1985), for the proposition that a person does not willfully violate an order when they act in good faith reliance on an attorney's advice. Appellant argues that "[i]f good faith reliance on an attorney's advice prevents willfulness then a good faith intent to seek legal advice . . . must also prevent the refusal from being willful." This argument is unpersuasive.

As stated above, appellant cites *Rapanos*, 143 Mich App 483, for the proposition that a person does not willfully violate an order when they act in good faith reliance on an attorney's advice. *Rapanos*, however, provides no such support. In *Rapanos*, this Court stated: "The federal courts have ruled that when an individual in good faith relies upon his attorney's advice or interpretation of a court order, he cannot be found guilty of criminal contempt since the element of an intentional violation of the court's order has not been established." *Id.* at 495. Though the *Rapanos* Court referred to the federal rule, there is no indication that it adopted it. Further, precedent from our Supreme Court holds that it is no defense that the contemnor violated a court order on the advice of counsel. *Brown v Brown*, 335 Mich 511, 518-519; 56 NW2d 367 (1953); *Chapel v*

*Hull*, 60 Mich 167, 175; 26 NW 874 (1886). Moreover, even if the federal rule was applicable, appellant has not cited any authority to support an extension of the rule to situations where an individual refuses because he or she intends to seek the advice of counsel. Accordingly, appellant's argument is without merit.

The evidence supports the family court's finding. There is no dispute that an order was entered on January 14, 2011, requiring appellant to submit to random drug testing at the request of the probation department. The probation department then made such a request, and appellant refused. Grohman testified that she did not show appellant a copy of the order; however, Grohman stated that she spoke with appellant and that appellant was aware of the order. Alcala was present when Grohman spoke with appellant and requested appellant take a drug test. Alcala stated that Grohman explained to appellant that there was a court order and that appellant appeared to understand. Thus, there was competent evidence to support the family court's finding that the elements of criminal contempt were proved beyond a reasonable doubt.

Affirmed.

K. F. KELLY, P.J., and MARKEY and FORT HOOD, JJ., concurred.