# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* CONTEMPT OF ALI HOJAIJ.

---

SAADA HOJAIJ,

        Plaintiff-Appellee,

and

DAVID FINDLING, Court-Appointed Receiver,

        Appellee,

v

ALI HOJAIJ,

        Defendant-Appellant.

UNPUBLISHED
August 30, 2018

No. 337911
Wayne Circuit Court
LC No. 16-112745-DM

---

Before: CAMERON, P.J., and RONAYNE KRAUSE and TUKEL, JJ.

PER CURIAM.

In this contempt matter arising out of a divorce case, defendant, Ali Hojaij, appeals as of right the trial court's judgment finding him guilty of two counts of criminal contempt. We affirm.

## I. FACTUAL BACKGROUND

Defendant is a restauranteur who co-owns several restaurants with his wife, plaintiff Saada Hojaij. Defendant's contempt convictions stem from his admitted violation of two November 8, 2016 orders: a mutual restraining order regarding the parties' finances (the status quo order), and an order appointing a receiver (the receivership order). At a contempt hearing, defendant admitted that he was present, and represented by counsel who argued against entry of such orders, at the November 8, 2016 status conference when the trial court entered the two

-1-

orders.[1] He further admitted that he was given a copy of the status quo order, but denied having read it.[2] The status quo order prohibited the parties from "[c]oncealing, secreting, selling, assigning, transferring, conveying, mortgaging, or otherwise disposing of or encumbering any of the real and personal property owned by . . . or in the possession or under the control of" the parties during the pendency of the case. The receivership order similarly enjoined the parties from concealing or disposing of property belonging to the receivership estate.

On November 9, 2016, the day after the trial court entered the status quo and receivership orders, defendant admittedly wrote two checks from restaurant business accounts, made payable to him in the amount of $50,000 each, and deposited them in his personal bank account. Defendant subsequently wired that entire sum (i.e., $100,000) from his personal bank account to the Canadian bank account of his cousin, Sam Mourtada, who is a resident of Windsor, Ontario. According to both Mourtada and defendant, this was in satisfaction of a $100,000 debt that defendant owed Mourtada.

When the receiver initially attempted to assume control over the restaurant businesses—as authorized by the receivership order—defendant refused, threatening to close both restaurants rather than permit the receiver to manage them. The trial court intervened, again ordering defendant to cooperate with the receiver, and defendant initially relented.

However, after the receiver had assumed management of the restaurant businesses, defendant surreptitiously obtained wireless credit-card terminals and began processing some of the payments to both the restaurants and for catering through them. In order to avoid detection by the receiver, defendant arranged to have the proceeds deposited into the bank account of nonparty Hassan Rida, an employee of the credit-card processing company that the restaurants used. Of the approximately $28,000 in charges that defendant processed through the wireless terminals, Rida remitted $20,000 to defendant in cash. Defendant admitted that he had obtained wireless credit card terminals from Rida's company, that he stored them at the restaurants, that he was the sole employee with access to them, that he is the only employee who ever used them, that he used them in lieu of the restaurants' preexisting credit-card terminals to collect payments from customers for both catering sales and other sales, and that he personally retained the $20,000 he received from Rida. Defendant further admitted that he intentionally took steps to conceal catering orders from the receiver after the receiver had assumed control of the businesses. Defendant explained that his underlying motive was the protection of his livelihood,

---

[1] Contrary to MCR 7.210(B)(1), defendant has failed to provide this Court with transcripts of numerous proceedings that were held in the trial court, including relevant proceedings such as the November 8, 2016 status conference, a January 19, 2017 settlement conference, and a March 13, 2017 motion hearing. In written correspondence dated April 24, 2018, this Court requested those specified transcripts. Defendant's counsel failed to produce the requested transcripts or otherwise respond to this Court's request.

[2] Defendant also acknowledged being aware that in the parties' previous divorce action in 2015, which was ultimately dismissed at the parties' request in hopes of reconciliation, the court had entered a similar restraining order regarding the parties' finances.

stemming from his belief that the receiver was mismanaging the restaurants and was "going to ruin" them.

After the receiver discovered defendant's actions, he moved for defendant to be held in criminal contempt. Following a show-cause hearing, the trial court took judicial notice of its previous orders. It held that the contempt at issue in this case was indirect because it was not committed in the presence of the court, further holding that because the court was motivated by a desire to punish defendant for his past acts—not seeking to coerce defendant into returning the money at issue—the proper contempt remedy was criminal rather than civil in nature. The trial court discounted the testimony of defendant and Mourtada about the alleged $100,000 "loan," finding that such testimony was not credible. In particular, the court described their alleged written agreement evidencing the debt as "appallingly unconvincing." The court concluded, regardless, even if the debt had been valid and Mourtada had demanded repayment, that did not authorize defendant to violate the trial court's orders, especially given that the parties' alleged written agreement did not specify when the purported debt was due. Moreover, based on its credibility determinations, the trial court concluded that defendant's violation of the court's orders had been willful. Thus, the trial court held that defendant was guilty of two counts of criminal contempt, one for the $100,000 transfer and the other for "surreptitiously" using the wireless credit-card terminals to circumvent the receivership.

## II. STANDARDS OF REVIEW

On appeal, defendant raises several claims of error, thereby implicating several standards of review. A challenge to the sufficiency of the evidence following a bench trial is reviewed de novo, *People v Lanzo Constr Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006), as is the question of whether a criminal defendant has a constitutional right to a jury trial in a given case, *People v Antkoviak*, 242 Mich App 424, 430; 619 NW2d 18 (2000). We also review de novo the legal question of whether an issue is moot. *People v Wood*, 321 Mich App 415, 420; 910 NW2d 364 (2017).

On the other hand, "[w]e review a trial court's issuance of a contempt order for an abuse of discretion and the factual findings supporting the order for clear error." *In re Moroun*, 295 Mich App 312, 335; 814 NW2d 319 (2012). An abuse of discretion occurs when the trial's court's decision results in an outcome that falls outside the range of principled outcomes. *Id*. at 335-336. "To the extent that this Court must examine questions of law related to the trial court's contempt decision, our review is de novo." *Id*. at 336.

## III. ANALYSIS

Defendant raises several claims of error. We address each in turn.

### A. NATURE OF THE APPROPRIATE CONTEMPT REMEDY

Defendant first argues that the trial court either erred or abused its discretion by holding him in criminal contempt rather than civil contempt. We disagree.

"When a court seeks to compel a contemnor to comply with its order requiring or forbidding some particular act, the court may use the *coercive* sanctions permitted by civil

contempt[.]" *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 711; 624 NW2d 443 (2000). However, a trial court may exercise its civil contempt powers only if the contumacious conduct "persist[s] at the time of the contempt hearing[.]" *Id*. at 712. In other words, as this Court observed in *Moroun*, 295 Mich App at 336:

> In the civil context, . . . confinement must be conditional. See MCL 600.1715.
>
> > The critical feature that determines whether the remedy is civil or criminal in nature is not when or whether the contemnor is physically required to set foot in a jail but whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order. [Quoting *Hicks ex rel Feiock v Feiock*, 485 US 624, 635 n 7; 108 S Ct 1423; 99 L Ed 2d 721 (1988).]

Defendant admits in his brief on appeal that his violations of the trial court's orders all occurred and ended before the show-cause hearing began. He further admits that, at the show-cause hearing, he offered to immediately return all of the funds that he had improperly diverted from the receivership estate. Thus, given the stated offer to return the funds, the trial chose not to exercise its civil contempt powers in order to coerce his return of the money. In light of defendant's offer to return all such money voluntarily and immediately, there would have been no persisting contempt to remedy. See *Moroun*, 295 Mich App at 336; *Auto Club*, 243 Mich App at 711-712. However, to this Court's knowledge, defendant has yet to return any of the ill-gotten funds to the receivership estate.

Criminal contempt, on the other hand, does not serve coercive ends; it "serves a very different purpose . . . in that it punishes the contemnor for past conduct that affronts the court's dignity." *Auto Club*, 243 Mich App at 713. Because an order of criminal contempt does not attempt "to force the contemnor to comply with an order," "it is impossible to purge this sort of contempt by acting in any particular manner." *Id*.

In this case, the trial court made it abundantly clear that its contempt order was not intended to coerce defendant into compliance with the court's orders but was rather intended to punish him for his past violations of such orders. Even defendant's offer to immediately return the money did not purge him of the contempt. Therefore, the trial court correctly determined that the applicable remedy was criminal contempt, not civil contempt.

### B. SUFFICIENCY OF THE EVIDENCE OF INTENT

Next, defendant argues that there was insufficient evidence of intent to sustain his contempt convictions. We disagree.

When reviewing the legal sufficiency of the evidence, all record evidence must be viewed in the "light most favorable to the prosecutor"—here, the receiver—"to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." See *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

> The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the . . . verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. [*People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted).]

An inference founded upon another inference can be drawn in support of the verdict, and "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

"To support a conviction for criminal contempt, two elements must be proven beyond a reasonable doubt": (1) that the contemnor acted in "wilful disregard or disobedience of the order of the court, and (2) that the contempt must be clearly and unequivocally shown." *In re Contempt of Dorsey*, 306 Mich App 571, 591; 858 NW2d 84 (2014), aff'd in part, vacated in part on other grounds 500 Mich 920 (2016) (quotation marks and citation omitted); accord *People v Matish*, 384 Mich 568, 572; 184 NW2d 915 (1971).

With regard to the contempt conviction related to defendant's transfer of $100,000 to Mourtada, defendant contends that there is "no evidence" that he understood the substance of the trial court's orders. Preliminarily, by failing to provide this Court with all of the pertinent transcripts—despite this Court's request for him to do so—defendant has waived our consideration of this issue. See MCR 7.210(B)(1)(a); *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000) (noting that appellants bear "the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal [i]s predicated"). Without transcripts of all pertinent proceedings, we cannot determine what instructions the trial court might have given defendant on the record about the relevant orders and his obligations under them. We will not reverse the trial court on the basis of defendant's selective presentation of only a portion of the record.[3]

---

[3] In any event, defendant's argument is unpersuasive on the merits of the limited record that he *has* produced. He ignores the well-settled principle that circumstantial evidence can be sufficient for a rational trier of fact to conclude that an element of an offense was proven beyond a reasonable doubt. See, e.g., *People v Bass*, 317 Mich App 241, 264; 893 NW2d 140 (2016). Defendant also ignores the axiom that "because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). In this instance, defendant admittedly: was present at the November 8, 2016 status conference, was represented by counsel who argued against entry of the status quo order and the receivership order, received a copy of the court orders, and, the very next day, violated both orders, transferring $100,000 to Mourtada. From such circumstantial evidence, a rational trier of fact could infer that the timing was not coincidental—that defendant willfully violated the trial court's orders as soon as he had the

Defendant's argument concerning the wireless credit-card terminals is also unavailing. Essentially, he argues that his conduct was not willful because he had reasonable concerns about the wisdom of the receiver's business management, and those concerns led to him feel compelled to protect his livelihood by circumventing the receivership. But defendant's subjective belief that the trial court's orders were unwise or unfair did not entitle him to disobey those orders with impunity. "[N]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." *Okrie v Michigan*, 306 Mich App 445, 470; 857 NW2d 254 (2014), quoting *Caperton v AT Massey Coal Co, Inc*, 556 US 868, 876; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), quoting The Federalist No. 10 (James Madison) (J. Cooke ed, 1961), p 59. As explained in *In re Contempt of Dudzinski*, 257 Mich App 96, 111; 667 NW2d 68 (2003):

> Civil disobedience is not the appropriate course of action when a person disagrees with a court order. We are a society of laws and the legal remedy available to appellant was to seek leave to appeal the trial court's order . . . A person may not disregard a [legal][4] court order simply on the basis of his subjective view that the order is wrong or will be declared invalid on appeal. Allowing such behavior would encourage noncompliance with valid court orders on the basis of misguided subjective views that the orders are wrong. There exists no place in our justice system for self-help.

See also *Kirby v Mich High Sch Athletic Ass'n*, 459 Mich 23, 40; 585 NW2d 290 (1998) ("A party must obey an order entered by a court with proper jurisdiction, even if the order is clearly incorrect, or the party must face the risk of being held in contempt and possibly being ordered to comply with the order at a later date."). Thus, defendant's instant intent argument is meritless. Indeed, by arguing that he intentionally circumvented the receiver as a form of "economic self-defense," defendant tacitly admits that his conduct was willful.

## C. RIGHT TO A JURY TRIAL

Defendant argues that the trial court erred by depriving him of his constitutional right to a jury trial.[5] Because defendant had no constitutional right to a jury trial for these offenses, we disagree.[6]

---

opportunity to do so, hoping to divert funds from the receivership estate before the receiver commenced enforcement. The trial court was under no compunction to accept defendant's testimony to the contrary, and in any event, all credibility determinations must be drawn in favor of the trial court's verdict. Therefore, we reject defendant's intent argument regarding the $100,000 transfer.

[4] This Court acknowledges that orders that are beyond the jurisdiction of a given court are, obviously, unenforceable. See *Scott v McNeal*, 154 US 34, 46; 14 S Ct 1108; 38 L Ed 896.

[5] Defendant does not argue that he was entitled to a jury trial under MCR 6.401.

As discussed at some length in *Antkoviak*, 242 Mich App at 470, in *Cross Co v United Auto, Aircraft & Agricultural Implement Workers of America, Local 155*, 377 Mich 202, 211; 139 NW2d 694 (1966), our Supreme Court held, "[W]e are not ready—as the United States Supreme Court has not been ready—to declare it is a necessary constitutional prerequisite to a criminal contempt proceeding that a defendant be afforded a jury trial." Thus, "Michigan law does not independently offer a right to a jury trial in such cases." *Antkoviak*, 242 Mich App at 472.

However, two years after *Cross Co* was decided, the United States Supreme Court held, in *Bloom v Illinois*, 391 US 194, 198; 88 S Ct 1477; 20 L Ed 2d 522 (1968), "that *serious* contempts are so nearly like other serious crimes that they are subject to the jury trial provisions of the Constitution," clarifying that, like other petty offenses, *petty* contempt offenses can "be tried without honoring a demand for a jury trial." (Emphasis added.) "Therefore, Michigan courts . . . apply the federal serious crime versus petty offense analysis when determining the right to a jury trial in this context." *Antkoviak*, 242 Mich App at 464.

If there is not a legislatively defined "maximum penalty which may be imposed, we are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." *Bloom*, 391 US at 211. Hence, in deciding whether the contempt offenses at issue in this case were petty or serious, we consider the penalty that defendant actually received—two concurrent jail terms of 42 days—not the purported maximum term of 93 days set forth by MCL 600.1715(1). See *Bloom*, 391 US at 211.[7]

Regardless, in this case the point is academic. A contempt offense punished by less than six months' imprisonment is a petty offense. *People v Goodman*, 17 Mich App 175, 178-79 n 6;

---

[6] We reject the receiver's contention that defendant waived this issue by failing to raise it below. Before the show-cause hearing, defendant filed a brief in the trial court arguing that he was entitled to a jury trial. Thus, we conclude that this issue is duly preserved for appellate review. See *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997).

[7] Defendant does not argue that the sanctions (of $7,500) and restitution (of $120,000) ordered by the trial court constituted criminal "punishment," nor does he argue that they should be considered for purposes of this petty-versus-serious-offense calculus. Thus, defendant has abandoned any such arguments. See *People v McPherson*, 263 Mich App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue."). In any event, in our view the ordered restitution cannot rationally be viewed as a criminal "punishment" in this context—it merely ordered defendant to return money to the receivership estate that he had already offered to return and which he never had a right to take or retain in the first instance. Moreover, the sanctions of $7,500 were not in the form of a criminal fine, they simply compensated the receivership estate for the depletion it suffered as a direct result of defendant's contumacious conduct. Indeed, the $7,500 in "sanctions" arguably should have been included in the restitution figure, not labeled as sanctions. See *People v Bryant*, 319 Mich App 207, 212; 900 NW2d 360 (2017) (noting that restitution should be ordered in "the amount required to make the victim whole.").

169 NW2d 120 (1969); *Cheff v Schnackenberg*, 384 US 373, 380-381; 86 S Ct 1523; 16 L Ed 2d 629 (1966). Because defendant ultimately received concurrent sentences of 42 days in jail, the contempt offenses at issue here were petty, and he was not entitled to a jury trial.

## D. REASONABLENESS OF THE SENTENCES

Finally, defendant argues that the sentences imposed against him were unreasonable because they are disproportionate under the *Milbourn*[8] proportionality test. Because defendant has already fully served his sentences, this issue is moot. Accordingly, we decline to address it. See *Dudzinski*, 257 Mich App at 112.

Affirmed.

/s/ Thomas C. Cameron
/s/ Amy Ronayne Krause
/s/ Jonathan Tukel

---

[8] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).